Dwayne Allen Wright

v.

Commonwealth of Virginia

Record Nos. 920810 and 920811

February 26, 1993

Present: All the Justices

*Leonard R. Piotrowski (Michael S. Arif; Martin, Arif, DeWilde & Soloway,* on briefs), for appellant.

*Oliver L. Norrell, III, Assistant Attorney General (Mary Sue Terry, Attorney General; Kathleen B. Martin, Assistant Attorney General,* on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

In these appeals, we review two capital murder convictions and a death penalty imposed upon Dwayne Allen Wright, together with convictions for robbery, use of a firearm in the commission of a robbery, and attempted rape.

I

PROCEEDINGS

Wright, a juvenile, was tried as an adult upon a five-count indictment charging (1) capital murder of Saba Tekle in the commission of robbery while armed with a deadly weapon, in violation of Code § 18.2-31(4); (2) capital murder of Saba Tekle subsequent to attempted rape, in violation of Code § 18.2-31(5); (3) robbery of Saba Tekle, in violation of Code § 18.2-58; (4) use of a firearm in the commission of robbery, in violation of Code § 18.2-53.1; and (5) attempted rape of Saba Tekle, in violation of Code § 18.2-61. In a single trial, a jury found Wright guilty on all offenses as charged.

At the penalty phase of the capital murder trial, after hearing evidence in aggravation and in mitigation, the jury found the "future dangerousness" predicate to be present and unanimously fixed Wright's punishment at death for the two capital murder convictions. After considering a probation officer's report and conducting a sentencing hearing, the court sentenced Wright in accord with the jury verdict on the capital offenses.

The court also sentenced Wright to life imprisonment for robbery, to 10 years' imprisonment for attempted rape, and to two years' imprisonment for use of a firearm in the commission of robbery.

We have consolidated Wright's appeal of the capital murder convictions, Record No. 920810, with the automatic review of his death sentence, Code § 17-110.1(A) and (F), and have given them priority on our docket, Code § 17-110.2. We also have certified from the Court of Appeals Wright's appeals of his non-capital convictions, Record No. 920811, and have consolidated the two records for our consideration.

## II

### PRETRIAL MATTERS

### A

#### *Death Penalty for Juvenile*

Wright was born on September 4, 1972. He was, therefore, 17 years of age when the alleged offenses occurred.

■ Wright concedes that "there is no substantive Eighth Amendment bar to executing seventeen (17) year olds." He contends, nonetheless, that the punishment violates society's evolving standards of decency. The Supreme Court rejected this precise contention in *Stanford* v. *Kentucky*, 492 U.S. 361 (1989), and, consistent with *Stanford*, we reject Wright's contention.

### B

#### *Transfer Proceedings*

By order entered May 2, 1991, the juvenile and domestic relations district court (the juvenile court) transferred Wright to the circuit court pursuant to the provisions of Code § 16.1-269.[1] The juvenile court, based upon a study and report by a probation officer and other evidence, made the following findings:

1. [Wright] is not mentally retarded or criminally insane.

---

[1] Code § 16.1-269(A) provides that if a child is 15 years of age or older and is charged with an offense that, if committed by an adult, could be punishable by confinement in a state correctional facility, the juvenile court, on motion of the Commonwealth's Attorney, shall hold a transfer hearing and may transfer the child to the appropriate circuit court for trial.

2. [Wright] is not, in the opinion of the Court amenable to treatment or rehabilitation as a juvenile through available facilities considering the nature of the present offenses.

3. The interests of the community require that [Wright] be placed under legal restraint or discipline.

Thereafter, Wright appealed the transfer decision to the circuit court, and that court wrote to counsel as follows:

The Court has carefully reviewed all papers, reports and orders and concluded that § 16.1-269 of the Code of Virginia (1950) has been fully complied with. There is neither a need nor a requirement for a further certification hearing in this Court. There is a clear report by a mental health professional and a clear finding by the Juvenile and Domestic Relations District Court Judge that the defendant is not mentally retarded.

Accordingly, the Attorney for the Commonwealth may seek an indictment.

On June 3, 1991, the circuit court entered an order stating that Code § 16.1-269 "has been fully complied with."

Wright contends that his rights were violated when he was transferred from the juvenile court to be tried as an adult in the circuit court. He advances three arguments in support of this contention.

First, Wright claims that his right under the Eighth Amendment of the Federal Constitution was violated because Code § 16.1-269 does not mandate consideration of his moral responsibility or psychological maturity. Relying upon *Stanford*, Wright argues that he was deprived of the "individualized consideration" required before a state may impose the death penalty on a juvenile. He asserts that "only those juveniles who were given individualized consideration of both their moral culpability and maturity at both the transfer and sentencing hearings" may be given the death penalty. We do not agree.

In *Thomas v. Commonwealth*, 244 Va. 1, 4-5, 419 S.E.2d 606, 607-08, *cert. denied* , ___ U.S. ___, 113 S.Ct. 421 (1992), a 17-year-old defendant waived the transfer hearing. Subsequently, he requested such a hearing, but the trial court denied his request. *Id.* at 7, 419 S.E.2d at 609. On appeal, Thomas contended that a transfer

hearing was mandated in a capital case in order to provide the individualized consideration required by the Federal Constitution before a state may impose the death penalty. *Id.* In rejecting Thomas' contention, we held that the Constitution does not require transfer hearings or additional procedural safeguards for juveniles tried for capital offenses. *Id.* We noted that "Virginia's death penalty statutes provide for individualized consideration of all those tried on capital charges." *Id* .[2]

Next, Wright asserts that his constitutional rights were violated because a guardian *ad litem* was not appointed to protect his interests at the transfer hearing. We reject this assertion.

■ A defendant under a disability who is represented by counsel need not have appointed to him a guardian *ad litem* unless a statute applicable to a particular case expressly requires such an appointment. Code § 8.01-9(B); *Mickens* v. *Commonwealth*, 178 Va. 273, 280-81, 16 S.E.2d 641, 644, *cert. denied*, 314 U.S. 690 (1941).

Wright was represented by counsel in the transfer hearing, and the transfer statutes (Code §§ 16.1-269 to -272) do not expressly require the appointment of a guardian *ad litem*. Consequently, the juvenile court was not required to appoint a guardian *ad litem* to represent Wright.

Finally, Wright claims that the transfer was invalid because the circuit court "failed to address the issue of 'criminal insanity.' "[3] We do not agree.

The juvenile court granted Wright's request for a mental evaluation pursuant to Code §§ 19.2-169.1 and -169.5. The evaluation was made by a qualified psychologist, and the results were given to Wright's counsel. The juvenile court expressly found that Wright "is not . . . criminally insane."

■ An accused is presumed to be sane. *Taylor* v. *Commonwealth*, 208 Va. 316, 322, 157 S.E.2d 185, 189 (1967). If the accused intends to rely upon insanity as a defense, he must affirmatively raise the issue. *Shifflett* v. *Commonwealth*, 221 Va. 760, 769, 274

---

[2] Additionally, as previously noted, the record in the present case shows that, before the juvenile court ordered Wright's transfer, it considered a study and report that was made by a probation officer concerning Wright's social history.

[3] We will assume, without deciding, that the circuit court failed to address the insanity issue. However, as previously noted, in its order affirming the transfer, the circuit court concluded that Code § 16.1-269 "has been fully complied with."

S.E.2d 305, 310 (1981). Additionally, an accused must bear the burden of proving his insanity to the satisfaction of the fact finder. *Taylor*, 208 Va. at 322, 157 S.E.2d at 189-90.

█ In his appeal of the decision to transfer him to the circuit court, Wright did not raise the question concerning his sanity. Moreover, nothing in the record suggests that Wright may be insane.

## C

### *The Confession*

A short time after Wright was arrested in the District of Columbia, Thomas J. Lyons, a Fairfax County police officer, went to the police station where Wright was being held. Although Officer Lyons testified that Wright did not request that his mother be present, the police made two unsuccessful attempts to contact his mother by telephone.

On the day of his arrest, Wright was advised of his *Miranda* rights three times, once by the Washington, D.C. police and twice by Officer Lyons. According to Lyons, Wright said he understood his rights. Before making any statement, Wright signed a consent form. Wright then related the events leading up to the crime and confessed to the shooting of Tekle.

Wright testified that Lyons told him that ''it would be better for [Wright] to come out with it. It would help [Wright] out during [his] sentence or something like that.'' Lyons, however, testified unequivocally that he did not make any promises of leniency to Wright.

Wright had experienced a number of prior arrests. He knew that he had the right to remain silent, to have a lawyer present, and that what he said could be used against him at trial.

Intelligence tests revealed that Wright is in the ''borderline range of intelligence'' and ''functions in at least the low average level.'' A clinical psychologist who testified on Wright's behalf opined that Wright's test scores were ''underestimates.'' His verbal scores were low because of his lack of a formal education. The witness further opined that ''these tests don't measure all aspects of . . . Wright's intelligence,'' and that Wright had ''street smarts.''

Wright contends that his statement to the police was involuntary and should have been suppressed. He asserts that the '' 'totality of

the circumstances' approach'' shows that his statement was involuntary. He suggests four circumstances, *viz*: (1) he was a juvenile, (2) his intelligence level was ''below average,'' (3) his mother was not present at the interrogation, and (4) he was promised leniency.

■ Our standard of review for determining whether an accused's statement was voluntary is set forth in *Gray* v. *Commonwealth*, 233 Va. 313, 324, 356 S.E.2d 157, 163, *cert. denied*, 484 U.S. 873 (1987):

> A defendant's waiver of his *Miranda* rights is valid only if the waiver is made knowingly, voluntarily and intelligently. *Miranda* [v. *Arizona*], 384 U.S. [436,] 475 [(1966)]. Whether a statement is voluntary is ultimately a legal rather than factual question. *See Miller* v. *Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 450 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. *Id.* at 112, 106 S.Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the ''product of an essentially free and unconstrained choice by its maker,'' or whether the maker's will ''has been overborne and his capacity for self-determination critically impaired.'' *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a defendant's will has been overborne, courts look to ''the totality of all the surrounding circumstances,'' *id.* at 226, including the defendant's background and experience and the conduct of the police, *Correll* v. *Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357 [, *cert. denied*, 482 U.S. 931] (1987); *Stockton* [v. *Commonwealth*], 227 Va. [124,] 140, 314 S.E.2d [371,] 381 [*cert* . *denied*, 469 U.S. 873 (1984)].

*Accord Mueller* v. *Commonwealth*, 244 Va. 386, 394, 422 S.E.2d 380, 386 (1992).

The trial court considered the circumstances advanced by Wright and held that his confession was voluntary. The court agreed with Wright's psychologist and concluded that Wright ''gave the appearance of one who has considerably more intelligence'' than the tests reveal. The court observed that Wright spoke and understood ''in a way that leads [the court] to believe that [Wright] has . . . street smarts well beyond any level of education or of an IQ test.''

The court also found that the police tried to contact Wright's mother, but that they were unable to do so. The court would not

speculate about what might have happened had the police been able to reach Wright's mother. The court noted, however, that Wright "was not in an unfamiliar place," that he had known one of the officers since early childhood, and that he was not afraid.

The court expressly found that Officer Lyons made no promises of leniency to Wright. The court determined that Wright "knowingly, intelligently waived his rights and made a voluntary statement."

■ Applying the standard of review stated in *Gray*, we agree that Wright's waiver of his *Miranda* rights was made knowingly, voluntarily, and intelligently. Thus, we find that Wright's will was not overborne and that his statement was the product of his free will and, therefore, voluntary.

## III

## JURY MATTERS

### A

### *Prospective Juror Carson*

Wright contends that his equal protection rights were violated by the Commonwealth's peremptory strike of prospective juror Dora Holiday Carson, an African-American. Wright also is an African-American.

■ In *Batson* v. *Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court ruled that purposeful discrimination based upon race in selecting jurors violates the Equal Protection Clause. Once an accused makes a *prima facie* showing of such purposeful discrimination, a prosecutor must give a reasonable explanation in rebuttal, showing that his reason for a peremptory strike was race neutral. *Id.* at 93-94. If the prosecutor's reason is based upon factors other than a juror's race, it is deemed to be race neutral. *Hernandez* v. *New York*, ____ U.S. ____, ____, 111 S.Ct. 1859, 1866 (1991). To constitute an equal protection violation, discriminatory intent must be inherent in the prosecutor's explanation. *Id.* A trial court's determination whether the reason is race neutral is entitled to great deference. *Spencer* v. *Commonwealth*, 238 Va. 295, 310, 384 S.E.2d 785, 795 (1989), *cert. denied*, 493 U.S. 1093 (1990). The determination will not be reversed on appeal unless it is "clearly erroneous." *Hernandez*, ____ U.S. at ____, 111 S.Ct. at 1871.

During jury *voir dire*, the Commonwealth's Attorney asked Carson whether she could consider "both life imprisonment and the death penalty and decide which one is proper." Carson replied, "I don't know if I can. I don't know." When asked if she would have to vote for life imprisonment if given both penalty options, Carson responded, "Probably so." Carson conceded, however, that there were cases in which she could vote for the death penalty.

Wright objected to the striking of Carson, and the Commonwealth's Attorney was asked to explain his reason for the strike.[4] The Commonwealth's Attorney explained his reason for striking Carson as follows:

[Carson] was equivocal about the death penalty. She was hesitant to answer questions about the death penalty and she said that she would have to be absolutely sure before she could ever vote for the death penalty in any case.

I took that to mean that she would require more than reasonable doubt. She would require absolute certainty.

In ruling that the Commonwealth's Attorney's reason for striking Carson was race neutral, the trial court stated the following:

I find as a fact that the strikes of Janet Knighton and Dora Carson, sometimes called Holiday, were based upon racially neutral considerations.

. . . .

I made notes that [Carson] said she would probably have to vote for life in prison, probably could not vote for death, would have to be sure and then she went on to say there were cases in which she could vote the opposite way.

But both [Knighton and Carson] gave indications in at least part of their answers of opposition to the death penalty.

And I believe [the Commonwealth's Attorney's] answer when he tells us why he struck those people and I find as a fact that they were stricken for reasons other than anything to do with their race.

---

[4] Wright does not challenge the striking of prospective juror Janet Knighton, who was also an African-American.

■ We think the trial court's determination is fully supported by the record. Accordingly, we hold that the Commonwealth's Attorney had a racially neutral reason for striking Carson.

## B

### The Juror Simpkins Incident

During a break in the trial, one of the jurors, Paula Simpkins, was sitting outside the courthouse, smoking a cigarette. Members of Tekle's family seated themselves close to Simpkins and spoke to each other in a foreign language that Simpkins did not understand. Simpkins, however, did hear these people mention the words "capital punishment" and "life imprisonment." There were no threats, no physical contact, and no pleas for sympathy by the members of Tekle's family.

Simpkins related this occurrence to five of her fellow jurors, and, at their suggestion, she informed the court about the incident. Simpkins said she felt intimidated by this incident to the extent that her objectivity as a juror was impaired.

Upon learning of the incident, the court questioned the remaining jurors to ascertain whether the incident would "in any way affect [their] ability to fairly decide this case." All of these jurors assured the court that the incident would not adversely affect them.

■ Over Wright's objection, the trial court excused Simpkins as a juror and replaced her with the alternate. The court found that there was no impermissible taint upon the remaining jurors. Wright, however, moved for a mistrial. The court overruled the motion, and Wright has assigned error to the ruling.

Whether to grant a mistrial is a matter resting within the sound discretion of a trial court. *Cheng* v. *Commonwealth*, 240 Va. 26, 40, 393 S.E.2d 599, 607 (1990). We hold that the trial court did not abuse its discretion in refusing to grant a mistrial. Indeed, we think the court resolved the matter in a proper manner.

## IV

## GUILT PHASE

## A

*Facts*

In October 1989, Tekle, age 33, resided with her mother and two sisters in an apartment located at Annandale, in Fairfax County. On October 13, Tekle had been visiting with Minia Gabriel at Gabriel's house in Arlington County. About 8:30 p.m., Tekle left Gabriel's house, driving Gabriel's burgundy Nissan Maxima automobile. Tekle had planned to return to Gabriel's house by 9:00 p.m.

About 9:00 p.m., Tekle's sister, Seble Kasa, was in the apartment and heard Tekle calling to her and her mother from outside the apartment. As Kasa walked to the exterior door of the apartment in response to Tekle's call, Kasa heard two gunshots, "one right after the other." When Kasa opened the door, she found Tekle lying on the floor at the bottom of a flight of stairs, and she heard someone running up the stairs.

An autopsy disclosed that Tekle had sustained a single gunshot wound to the right, upper back. The medical examiner, who performed the autopsy, testified that the bullet

> went in a forward, upward and rightward direction and injured the transverse processes or little bones that protrude from the sides of the backbone of the upper two thoracic backbones.
> [The bullet] also hit the right first rib. Then it injured the upper lobe of the right lung and continued through the soft tissue or muscles of the neck, perforated or passed through the right internal jugular vein and then exited the right lower neck.

The medical examiner opined that Tekle's death was caused by a "[p]erforating gunshot wound in the neck." Tekle also had sustained abrasions to the left forehead and to the right knee.

When Tekle's body was received by the medical examiner, it was clad only in a jacket, dress, brassiere, and some jewelry. Tekle's coat, underpants, shoes, and pocketbook were found on or near the sidewalk outside the apartment building.

The police discovered two "impact areas," caused by bullets, in the stairwell outside the apartment. One impact area was in a "header" above the staircase. The other was in the wall, 43 inches

above the floor on which Tekle's body was found. There was a large pool of blood on the floor around Tekle's body and a small amount of blood on the two steps nearest the floor. There was a bloody handprint on the apartment door.

Police were unable to locate the Nissan automobile at the crime scene. However, they did find a Buick automobile with its engine running. The left portion of the Buick's steering column had been "ripped off," allowing the automobile to be started without a key. Latent fingerprints recovered from the Buick later were determined to match Wright's fingerprints.

On October 14, a Washington, D.C. police officer, who had known Wright for a number of years, saw Wright operating a burgundy Nissan Maxima automobile. Wright looked at the officer and then "sped off at a high rate of speed, never stopping at [a] stop sign." The officer pursued Wright. Wright abandoned the automobile, and, after a brief chase on foot, the officer apprehended and arrested Wright. The keys to the Nissan were recovered from Wright's pocket.

After being advised of his *Miranda* rights and signing a waiver of those rights, Wright told a police officer that he had observed Tekle operating the Nissan automobile and decided that he wanted to steal the car. Wright followed Tekle to her apartment building and parked the Buick automobile where the police later found it. After Tekle exited her automobile, Wright approached her at gunpoint and demanded that she give him the keys to the Nissan. Tekle dropped the keys on the ground, and Wright picked them up. Wright then ordered Tekle to take off her clothes because he wanted to take her into a wooded area behind the apartment building and "have sex." Tekle removed her shoes and her underpants and then ran, screaming, toward the apartment building. Wright chased her into the building and fired two shots at her. He knew that one of the shots hit Tekle. Wright then left the area in the Nissan and disposed of the weapon.

B

*Evidence Pertaining to Stolen Buick Automobile*

Wright contends that the trial court erred in admitting into evidence testimony and photographs pertaining to the theft of the Buick automobile, a crime with which he was not charged. We do not agree.

■ Generally, evidence that an accused committed other crimes is inadmissible to prove the crime charged. *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). Such evidence is admissible, however, when it "is connected with or leads up to the offense for which the accused is on trial," *id.*; *accord Woodfin* v. *Commonwealth*, 236 Va. 89, 95, 372 S.E.2d 377, 380-81 (1988), *cert. denied*, 490 U.S. 1009 (1989), and when "the legitimate probative value outweighs the incidental prejudice to the accused," *Lewis* v. *Commonwealth*, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983).

■ In the present case, the challenged evidence was that the police found the stolen Buick automobile near the crime scene. The car had been "hot-wired" and abandoned, and Wright's fingerprints were found on the vehicle. This evidence placed Wright at the crime scene and corroborated Wright's confession. Clearly, this evidence led up to and connected Wright with the offenses for which he was being tried, and its probative value outweighed the incidental prejudice to Wright. Thus, the trial court did not err in admitting this evidence.

.C

*Photograph of Tekle's Apartment Door*

Wright contends that the trial court erred in admitting into evidence a photograph of the blood-stained door to Tekle's apartment. He argues that the photograph's "only potential value was to inflame the jury by demonstrating that Tekle may have been clawing at [the] door to gain entrance to [the]apartment or alert those inside of her peril."

■ Whether photographs should be admitted into evidence is a matter that rests within the sound discretion of the trial court. *Spencer* v. *Commonwealth*, 238 Va. 275, 290, 384 S.E.2d 775, 783 (1989), *cert. denied*, 493 U.S. 1036 (1990); *Bennett* v. *Commonwealth*, 236 Va. 448, 471, 374 S.E.2d 303, 317-18 (1988), *cert. denied*, 490 U.S. 1028 (1989); *Gray*, 233 Va. at 342, 356 S.E.2d at 173 (compiling cases). Photographs that accurately portray the crime scene are not rendered inadmissible simply because they are shocking or gruesome. *Spencer*, 238 Va. at 290, 384 S.E.2d at 783.

In the present case, the photograph of the door accurately portrayed the crime scene. It reasonably could be inferred from viewing the photograph that Tekle had been pursued by her attacker to her

apartment, had attempted to reach for the door to escape from her pursuer, and did not die instantaneously. Thus, the photograph was relevant to show malice and premeditation and to corroborate Wright's confession. We cannot say, therefore, that the trial court abused its discretion in admitting into evidence the photograph.

## D

### *Premeditation*

Wright contends that the evidence is insufficient to prove that he committed a premeditated act of murder. Wright argues that the evidence suggests a young man who "was scared and panic stricken firing a gun without any specific intent to kill." Wright further argues that Tekle's death "could almost be viewed as accidental, [she] having bled to death." This argument is meritless.

"To premeditate means to adopt a specific intent to kill." *Smith* v. *Commonwealth*, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980). Although the intent to kill must have existed at some time before the killing, the intent need not have existed for any particular length of time. *Id.* Indeed, "[a] design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Giarratano* v. *Commonwealth*, 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980); *accord Epperly* v. *Commonwealth*, 224 Va. 214, 231, 294 S.E.2d 882, 892 (1982). Ordinarily, whether premeditation exists is a question of fact, and, in resolving the issue, the fact finder may consider such factors as "the brutality of the attack" and "the defendant's lack of remorse and efforts to avoid detection." *Epperly*, 224 Va. at 232, 294 S.E.2d at 892.

In determining the sufficiency of the evidence on appeal, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the party who prevailed at trial. *Stockton*, 227 Va. at 145, 314 S.E.2d at 385. The trial court's judgment will be affirmed unless it is plainly erroneous or without evidence to support it. Code § 8.01-680; *Stockton*, 227 Va. at 145-46, 314 S.E.2d at 385.

Wright confessed to the shooting. He admitted that he followed Tekle from the highway to her apartment building and that he intended to have sexual intercourse with her. When Tekle resisted and fled, Wright chased her into her apartment building, to the bottom of her apartment steps, and fired two shots at her. Wright then

fled from the scene in the Nissan automobile and disposed of the murder weapon. Clearly, the evidence and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth, are sufficient to prove premeditation.

E

*Attempted Rape*

Wright contends that the evidence is insufficient to prove attempted rape. He asserts that the evidence fails to prove an intent to rape and that his acts, at most, did not go beyond mere preparation.

Rape is defined as "sexual intercourse against the victim's will by force, threat, or intimidation." *Hoke* v. *Commonwealth*, 237 Va. 303, 310, 377 S.E.2d 595, 599, *cert. denied*, 491 U.S. 910 (1989); Code § 18.2-61. To establish an attempt to commit rape, the Commonwealth must prove (1) an intent to commit the crime; and (2) some direct, but ineffectual, act toward its commission that goes far enough to amount to the commencement of the consummation of the crime. *Chittum* v. *Commonwealth*, 211 Va. 12, 15, 174 S.E.2d 779, 781 (1970). The act, however, "need not be the last proximate act to the consummation of the crime in contemplation." *Granberry* v. *Commonwealth*, 184 Va. 674, 678, 36 S.E.2d 547, 548 (1946). Intent is a state of mind that may be proved by an accused's acts or by his statements and that may be shown by circumstantial evidence. *Barrett* v. *Commonwealth*, 210 Va. 153, 156, 169 S.E.2d 449, 451 (1969).

As previously noted, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commonwealth. The evidence established that Wright, while holding Tekle at gunpoint, demanded that she remove her clothes because he desired to "have sex" with her in a wooded area behind the apartment building. In response to Wright's force, threat, and intimidation, and against her will, Tekle removed her shoes and underpants. Clearly, this evidence proved an intent to commit rape. Although the evidence did not prove that Wright's act was the last proximate act necessary to complete a rape, it did prove a direct, but ineffectual, act done toward the commission of rape that reached far enough toward its accomplishment to amount to the commencement of the consummation.

Wright also asserts that his statement to the police was uncorroborated and, therefore, standing alone, is insufficient to establish the corpus delicti. We do not agree.

■ Although the corpus delicti cannot be established by the uncorroborated confession of an accused, " 'only slight corroborative evidence' " is necessary to establish the corpus delicti when the accused confesses. *Williams* v. *Commonwealth*, 234 Va. 168, 175, 360 S.E.2d 361, 366 (1987) (quoting *Clozza* v. *Commonwealth*, 228 Va. 124, 133, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230 (1985)), *cert. denied*, 484 U.S. 1020 (1988).

In the present case, there was ample evidence to corroborate Wright's statement. The autopsy established that Tekle's underpants had been removed, and Tekle's underpants and shoes were found at the crime scene.

We hold, therefore, that the evidence is sufficient to prove attempted rape.

## V

### PENALTY PHASE

### A

#### *Facts*

The Commonwealth presented evidence that on October 14, 1989, Wright confessed to authorities of the Metropolitan Police Department for Washington, D.C. that he had killed a man named Odell Thomas on October 9, 1989. Wright told the police that Thomas had robbed him of a gold chain and a radio message "beeper" and had robbed Wright's friend, Bruce, of $400. Wright stated that, after having been robbed, he went to a friend's (Andre's) house and got a gun that belonged to Bruce and Wright. Wright and Bruce then rode around in Bruce's car looking for Thomas. Upon finding Thomas, Wright exited the car, approached Thomas from behind, and shot Thomas four times. Wright then took the gold chain, the $400, and Thomas' .38 caliber revolver and departed. When the police asked Wright where the .38 caliber revolver was located, Wright replied, "It's in the safe at Andre's house. There is $1,000.00 and a half kilo of cocaine in the safe too."

The Commonwealth presented an authenticated record from the Circuit Court of Prince George's County, Maryland. This record showed that, on August 31, 1990, Wright pleaded guilty to

attempted first degree murder and use of a handgun. The offenses occurred on October 12, 1989. The court found Wright guilty and sentenced him to life imprisonment for the attempted murder and to 20 years' imprisonment for using the handgun.

The Commonwealth introduced another authenticated record from the Circuit Court of Prince George's County, Maryland. This record disclosed that, on August 31, 1990, Wright pleaded guilty to first degree murder and use of a firearm. The victim, Reginald Turman, was killed on October 12, 1989. The court found Wright guilty of first degree murder and sentenced him to life imprisonment. The court also sentenced Wright to 20 years' imprisonment for using the firearm.

Dr. Arthur Centor, a clinical psychologist in forensic psychology, examined Wright to determine his competence to stand trial and his competence at the time of the alleged offenses. The doctor also examined Wright to ascertain factors in mitigation and in aggravation in the event Wright was found guilty of capital murder.

Dr. Centor testified that Wright has a verbal I.Q. of 76, which is "borderline,"[5] a performance I.Q. of 92, which is in the average range of intelligence, and a full scale I.Q. of 81, which is in the low average range. The doctor found nothing to indicate brain damage, emotional disturbance, or mental disorders. Based upon the examination and Wright's social history, Dr. Centor opined that "there is a high probability that [Wright] would, in the future, commit acts that are criminal, violent and a danger to society."

Wright presented the testimony of Dr. Stanton E. Samenow, a clinical psychologist. The trial court had appointed Dr. Samenow to act as Wright's psychological expert. Dr. Samenow interviewed Wright on four occasions for a total of approximately four and three quarters hours.

Dr. Samenow testified that he agreed with Dr. Centor's conclusions regarding Wright's intelligence. He also stated that Wright was neither psychotic nor neurotic and that there was no indication that Wright had brain damage. Dr. Samenow also testified regarding Wright's social history.

Wright was reared by his mother who was unemployed "for long periods of time." She was not very cooperative with school personnel, probation officers, and others in authority. Wright's father has

---

[5] According to the so-called "Wechsler Manual," "borderline" is between low average and mentally retarded.

been incarcerated since Wright was four years old. Wright had four half-brothers.

Wright was reared in a neighborhood in Washington, D.C., where "there was considerable drug activity." Stealing was prevalent in the neighborhood, and Wright "saw people getting shot and killed."

Wright was approximately 10 years old when one of his half-brothers was murdered at age 23. Wright was especially fond of his brother, and his death caused Wright to be very depressed.

When Wright was about 15 years of age, he was placed in a juvenile detention facility. While there, he thought about committing suicide, and, on one occasion, "he had put a sheet around his neck."

About the same time, Wright was hospitalized. Psychiatric evaluations indicated that Wright was having a "conduct disorder, a borderline intellectual disorder." He was treated with medication for "a major depression with psychotic features."

Wright had performed poorly in school, advancing only to the sixth grade. Wright can read, but does not read well.

Wright has had a long history of fighting. Indeed, Dr. Samenow stated that "[f]ighting has been a way of life" for him. Wright was always large for his age, and others often teased him about his size. This may have been a cause for his fighting.

Dr. Samenow did not express an opinion about whether Wright would be dangerous in the future. Although he feels that people in the field of psychology "are not terrific at predicting the future," he did acknowledge that "the best guide that [psychologists] have to the future is actually past behavior and ongoing thinking patterns and attitudes."

Wright's mother also testified in the sentencing phase. Her testimony tended to corroborate Wright's social history as related by Dr. Samenow.

B

*Dr. Samenow's Excluded Testimony*

In the penalty phase, Dr. Samenow sought to rely upon, and relate to the jury, information of which he had no direct knowledge or that had not been previously admitted into evidence. The trial court refused to allow such testimony, and Wright assigned error to the ruling, notwithstanding that the record discloses that the trial

court reconsidered its ruling and, ultimately, allowed Dr. Samenow to relate much of the information that Wright sought to introduce.

In *Buchanan* v. *Commonwealth*, 238 Va. 389, 416, 384 S.E.2d 757, 773 (1989), *cert. denied*, 493 U.S. 1063 (1990), the trial court excluded experts' testimony which sought to relate "out-of-court interviews and discussions" the experts had had in arriving at their opinions. We held that the trial court was "plainly correct" in excluding the hearsay evidence because "experts in criminal cases must testify on the basis of their own personal observations or on the basis of evidence adduced at trial." *Id.*; *accord Simpson* v. *Commonwealth*, 227 Va. 557, 565-66, 318 S.E.2d 386, 391 (1984). Adhering to our previous ruling, we conclude that the trial court's ruling in the present case was correct.

## C

### *Parole Eligibility*

■■■ Wright contends that the trial court erred in refusing to inform the jury about Virginia's laws regarding parole. We repeatedly have rejected this contention in capital murder cases. *See, e.g., Mueller*, 244 Va. at 409, 422 S.E.2d at 394; *King* v. *Commonwealth*, 243 Va. 353, 367-68, 416 S.E.2d 669, 677, *cert. denied*, ____ U.S. ____, 113 S.Ct. 417 (1992); *Eaton* v. *Commonwealth*, 240 Va. 236, 248-49, 397 S.E.2d 385, 392-93 (1990), *cert. denied*, 502 U.S. ___, 112 S.Ct. 88 (1991). Adhering to our previous ruling, we reject Wright's contention.

## D

### *Verdict Form*

Wright contends that the trial court erred in submitting the sentencing form. He advances two arguments, both of which are procedurally barred.

■■■ First, Wright argues that the form is erroneous because it recites two capital murder predicates and, therefore, emphasizes the aggravating factors and "neglects fair treatment of the mitigating circumstance of one being a lesser included offense and one death providing a single unit for prosecution and punishment." This challenge to the verdict form was not made at trial, and we will not consider it for the first time on appeal. Rule 5:25.

At trial, Wright objected to the submission of two separate sentencing forms (*i.e.*, one for each capital murder), arguing that the two forms would invite compromise and could result in double jeopardy if the jury imposed two death sentences for one murder. As a result of this argument, the trial court suggested that one sentencing form be submitted to the jury, combining the two underlying predicates, *i.e.*, robbery and attempted rape. The record shows that Wright agreed with the trial court's suggestion. Thus, having subsequently waived the objection, Wright is barred from raising this matter on appeal.

## E

### *The Non-Capital Offenses*

■ A juvenile who is convicted of a non-capital offense must be sentenced by the trial judge, even when he is tried by a jury. Code § 16.1-272. Wright contends, nonetheless, that he was denied equal protection when the trial court refused to allow him to be sentenced by the jury for the non-capital offenses. We rejected the same contention in *Ballard* v. *Commonwealth*, 228 Va. 213, 216-17, 321 S.E.2d 284, 286 (1984), *cert. denied*, 470 U.S. 1085 (1985). Adhering to that ruling, we reject Wright's contention.

Wright also contends that the trial court erred in refusing to instruct the jury about the maximum punishments he could receive for the non-capital offenses. He cites no authority for this contention, and we conclude that it is meritless.

## F

### *Sufficiency of the Evidence of Future Dangerousness*

Upon finding that a defendant is guilty of capital murder, the jury then must determine whether he shall be sentenced to death or to life imprisonment. Code § 19.2-264.4(A). In making the determination, the jury may consider "the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense." Code § 19.2-264.4(B).

The death penalty shall not be imposed unless the Commonwealth proves beyond a reasonable doubt that "there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is

accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.4(C). This is known as the "future dangerousness" predicate.

Wright contends that "a reasonable jury could not have found the aggravating factors of future dangerousness outweighed mitigating factors." We take this to mean that the evidence is insufficient to prove future dangerousness.

■ The evidence reveals that Wright previously had been convicted of first degree murder and had confessed to having committed another murder.[6] He also had been found guilty of attempted first degree murder. Wright's psychologist testified that Wright had a history of violence ("[f]ighting has been a way of life" for Wright). Furthermore, Dr. Centor, based upon his evaluation of Wright and Wright's background and history, concluded that there is a "high probability" that Wright would commit criminal acts of violence in the future and would constitute a danger to society.

We conclude, therefore, that there is ample evidence to support the jury's finding of future dangerousness.

## VI

### SENTENCE REVIEW

Code § 17-110.1 requires us to review the death sentence on the record. In doing so, we must consider and determine the following:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

---

[6] Wright also contends that the trial court erred in allowing the jury to consider this confession. We reject this contention. We consistently have held that such background information properly may be considered by a jury in the sentencing phase of a capital murder trial. *See, e.g., Stockton* v. *Commonwealth*, 241 Va. 192, 209-10, 402 S.E.2d 196, 206, *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991); *Spencer*, 238 Va. at 317, 384 S.E.2d at 798-99; *O'Dell* v. *Commonwealth*, 234 Va. 672, 700, 364 S.E.2d 491, 507, *cert. denied*, 488 U.S. 871 (1988); *Gray*, 233 Va. at 346, 356 S.E.2d at 175.

Code § 17-110.1(C).

Wright advances five grounds in support of his contention that the death penalty was imposed under the influence of passion, prejudice, or other arbitrary factors. The first ground relates primarily to the incident concerning Juror Simpkins and certain members of Tekle's family.[7] The second pertains to the sentencing form that was submitted to the jury. The third relates to the admissibility of evidence pertaining to the uncharged theft of the Buick automobile. The fourth ground deals with the photograph of the blood-stained apartment door. Lastly, Wright claims that the trial court erred in not instructing the jury about parole, about the maximum punishments for the non-capital offenses, and about the trial judge's imposition of sentence for the non-capital offenses.

We have considered and rejected all of these contentions elsewhere in this opinion. We also have concluded that the evidence supports the jury's finding of future dangerousness. Accordingly, we hold that there is nothing in the record to suggest that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We also conclude that Wright's death sentence is not excessive or disproportionate to penalties generally imposed by other sentencing bodies in Virginia. In reaching this conclusion, we have accumulated and reviewed the records of all capital murder cases decided by this Court. Code § 17-110.1(E). *See, e.g.*, *Spencer*, 238 Va. at 292-93, 384 S.E.2d at 784-85 (compiling cases).

---

[7] Wright claims that there were people in the courtroom during the trial who were commenting and reacting audibly to the evidence in an effort to intimidate the jury. The record does not support this claim. Indeed, the trial judge, who was in the best position to observe any misconduct in the courtroom, had it occurred, stated the following:

First let me say that I have no evidence that family members intentionally attempted to intimidate this juror or any other juror. I have not seen anything occur in the courtroom that I thought was an effort on the family members' part to do anything intentionally to the jury.

## VII
## CONCLUSION

Having considered all of Wright's assignments of error, we find no reversible error.[8] We have reviewed the sentence of death as mandated by Code § 17-110.1 and conclude that the sentence should be affirmed. Accordingly, the trial court's judgments will be affirmed.

*Record No. 920810 - Affirmed.*
*Record No. 920811 - Affirmed.*

---

[8] We do not consider Wright's ineffective assistance of counsel claim because the record is insufficient to allow a full and fair determination of the issue. *See, e.g., Mu'Min* v. *Commonwealth*, 239 Va. 433, 452-53, 389 S.E.2d 886, 898 (1990), *aff'd*, 500 U.S. ___, 111 S.Ct. 1899 (1991); *Beaver* v. *Commonwealth*, 232 Va. 521, 537-38, 352 S.E.2d 342, 351-52, *cert. denied* , 483 U.S. 1033 (1987); *Correll*, 232 Va. at 470, 352 S.E.2d at 362; *Walker* v. *Mitchell*, 224 Va. 568, 570-71, 299 S.E.2d 698, 699 (1983).