COURT OF APPEALS OF VIRGINIA

Present:   Judges Elder, Humphreys and Kelsey
Argued at Richmond, Virginia


TRAVIS DAREYLL FORD

v.        Record No. 0394-05-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE ROBERT J. HUMPHREYS
MARCH 21, 2006


FROM THE CIRCUIT COURT OF AMELIA COUNTY
Thomas V. Warren, Judge

(William R. Blandford, Jr.; Blandford & Newlon, P.C., on brief), for
appellant.  Appellant submitting on brief.

Robert H. Anderson, III, Senior Assistant Attorney General (Judith
Williams Jagdmann, Attorney General, on brief), for appellee.


Appellant Travis Dareyll Ford ("Ford") appeals his convictions for robbery, abduction,

and attempted capital murder, in violation of Code §§ 18.2-58, 18.2-47, 18.2-31, and 18.2-25,

respectively.  On appeal, Ford contends that the trial court erred in permitting the

Commonwealth to strike four potential jurors without articulating a non-pretextual, race-neutral

reason for their removal, in violation of the Supreme Court's holding in Batson v. Kentucky, 476

U.S. 79 (1986).  Ford also argues that the trial court erred in denying his motion to strike the

abduction charge, reasoning that the evidence was insufficient to support his conviction.  For the

following reasons, we disagree and affirm the judgment below.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.  Moreover, as this opinion has no precedential value, we recite only those facts necessary to our holding.

I.  THE BATSON CHALLENGE

The United States Supreme Court "has outlined the procedure for determining whether a prosecutor exercised a peremptory strike to remove a prospective juror solely on account of the juror's race."  Buck v. Commonwealth, 247 Va. 449, 450, 443 S.E.2d 414, 415 (1994).  First, "[a] defendant must first establish a prima facie showing that the peremptory strike was made on the basis of race."  Id.  Second, if the defendant makes such a showing, "the burden shifts to the prosecution to produce explanations for striking the juror which are race-neutral."  Id. at 451, 443 S.E.2d at 415.  Third, once the prosecution has articulated a race-neutral reason for removing the prospective juror, the defendant may persist with a Batson challenge by arguing that the reason advanced by the prosecution is pretextual.  Id.  Ultimately, "the trial court must decide whether the defendant has carried his burden of proving purposeful discrimination by the prosecutor in selecting the jury panel."  Id.  This determination "will be reversed [on appeal] only if . . . clearly erroneous."  Id.; see also Barksdale v. Commonwealth, 17 Va. App. 456, 459-60, 438 S.E.2d 761, 763-64 (1993) (*en banc*).

Here, Ford made his initial Batson challenge by pointing out that the Commonwealth had exercised four of its five peremptory strikes to remove African-American members of the venire panel.  Assuming for purposes of this appeal that Ford made a prima facie showing that those four individuals were removed solely because of their race,[1] the burden then shifted to the Commonwealth to articulate race-neutral reasons for their removal.  And, in response, the Commonwealth provided a race-neutral explanation for its decision to remove each of the five individuals struck from the venire panel.  Specifically, the first individual, an African-American, was struck because she was "looking all around the courtroom, not looking at the person who

---

[1] "Because the Commonwealth offered its reasons for the strikes, we need not consider whether [Ford] established a prima facie showing of discrimination."  Buck, 247 Va. at 451, 443 S.E.2d at 415.

was asking the question," which gave the Commonwealth "concern as to whether she would actually listen to the evidence as it was presented or be distracted by other things that were occurring in the courtroom." The second individual, also an African-American, was struck because she "is the cousin to one of the witnesses, [and] because she was recently convicted of a domestic assault." The third and fourth individuals—one of whom is African-American and the other of whom is Caucasian—were struck because "[t]hey are students" and "are extremely young" and that, "because of their age and because of the fact that they were students," the Commonwealth believed they "would not make good jurors for the Commonwealth." Finally, the fifth juror, an African-American, was struck because "she was friendly with the grandmother of the defendant."

After listening to the Commonwealth's explanation, the trial court concluded that Ford failed to prove that the four African-American veniremen "were struck for pretextual reasons." Considering the record as a whole, along with Ford's concession on brief that he does not believe "that the Commonwealth intentionally made [its] strikes with the intent to discriminate," that factual finding is not plainly wrong or without evidence to support it. Accordingly, we hold that this assignment of error is without merit. See generally Chandler v. Commonwealth, 249 Va. 270, 277, 455 S.E.2d 219, 223 (1995) (holding that the trial court did not err in denying the defendant's Batson challenge to the removal of three African-American members of the venire panel, reasoning that "the record supports the Commonwealth's stated reasons for the strikes in question").

## II. SUFFICIENCY OF THE EVIDENCE

When the sufficiency of the evidence in a criminal case is challenged on appeal, we view the evidence and all reasonable inferences fairly deducible from that evidence in the light most favorable to the Commonwealth, the party prevailing below. Walton v. Commonwealth, 255 Va.

422, 425-26, 497 S.E.2d 869, 871 (1988). "Great deference must be given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." Id. at 426, 497 S.E.2d at 871. Thus, a jury verdict will not be disturbed on appeal "unless it is plainly wrong or without evidence to support it." Id.

Code § 18.2-47 provides, in pertinent part, that "[a]ny person who, by force, intimidation, or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction' . . . ." Code § 18.2-47(A). Although, according to this statutory language, an abduction may be accomplished by either seizure, asportation, detention, or secretion, see Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984), the jury instruction proffered in this case focused on abduction by seizure and abduction by asportation. Accordingly, we must consider whether the evidence, when viewed in the light most favorable to the Commonwealth, was sufficient to establish that Ford, "by force, intimidation or deception," either "seize[d], t[ook], [or] transport[ed]" the victim, "without legal justification or excuse," and "with the intent to deprive [her] of [her] personal liberty." Code § 18.2-47(A).

Initially, Ford does not contend that he acted with "legal justification or excuse," nor does he argue that the evidence failed to prove that he used "force, intimidation or deception." Thus, we need only consider whether the evidence was sufficient to establish that Ford: (1) seized, took, or transported the victim, and (2) that he did so with the intent to deprive her of her personal liberty.

### A. Whether Ford "Seized, Took, or Transported" the Victim

Under the circumstances of this case, we conclude that the evidence, when viewed in the light most favorable to the Commonwealth, is sufficient to establish that Ford "seize[d], t[ook], [or] transport[ed]" the victim within the meaning of Code § 18.2-47. Specifically, the evidence

establishes that, on the afternoon of March 5, 2004, Darlene Weaver, a rural mail carrier, was driving down a road in Amelia County. Weaver, who was talking to her husband on her cell phone, saw Ford, then fifteen years old, standing along the side of the road. As Weaver began to slow down, Ford "started walking down and got in the middle of the road and flagged [her] down." Weaver rolled down her window, and Ford asked her if she could "give him a jump because the battery on his car was dead." Weaver responded that, according to "policy," she could not let him into her car while she was delivering mail, but that she would drive alongside him as he walked home. About halfway to Ford's home, however, Weaver changed her mind and told Ford "to forget this and come around the car and get in the back seat on the other side."

After Weaver drove Ford back to his house, Ford got out of her car and "popped the hood." Ford then turned to Weaver—who was still inside her car—and told her to give him her cell phone. When she refused, "in a little stronger voice he said give me the damn cell phone." Ford then grabbed a knife that had been concealed under his shirt, and Weaver yelled to her husband—who was still on the phone—that Ford had a knife.

At that point, Weaver "threw [her] car in reverse and tried to get away." Ford, however, "jumped in the window on the passenger side and grabbed the steering wheel and pulled [himself] all the way into the car" although Weaver was trying to "fight[] him off" so she could escape. The car—which was still in reverse—was "going around and around in circles." After a couple of seconds, Weaver told Ford that she was "giving up." Weaver, however, then "threw the car in drive and floored it." As they raced away, Weaver and Ford continued to wrestle for control of the car. When the car came to an intersection, Ford "tried to jerk the steering wheel to the right," and Weaver "jerked back." The car then went off the road and through "a bunch of

overgrown bush." As a result, Weaver "didn't end up going in the direction [she] wanted to go."[2]

After the car came to a stop, Ford attempted to put the car in reverse "to get it unhung because it was tangled up in all this brush." He was unsuccessful. Ford then began to choke Weaver, who passed out and did not regain consciousness until several minutes later. In the meantime, Ford fled.

From this evidence, the jury could reasonably have inferred that there was a period of time—however slight—that Ford gained control of the vehicle and forced Weaver to move in a direction other than the one in which she intended to go. Thus, the jury could reasonably have concluded that Ford both "seize[d]" Weaver, thereby accomplishing an abduction by seizure, and "t[oo]k" or "transport[ed]" her, thereby accomplishing an abduction by asportation. Cf. Krummert v. Commonwealth, 186 Va. 581, 585, 43 S.E.2d 831, 833 (1947) (holding that the evidence was sufficient to support the defendant's conviction for kidnapping with the intent to extort a pecuniary benefit where the defendant forced his way into the victim's car, pointed a gun at the victim, and directed the victim to drive north, reasoning that the defendant "took over [the victim's] automobile").

We further note that the jury implicitly adopted this very rationale. Upon defense counsel's request, the trial court instructed the jury on the crime of attempted abduction as well as the completed crime of abduction. And, during closing arguments, defense counsel argued that there was no abduction in this case because Weaver never testified that the assailant "got

---

[2] During the course of this incident, Weaver received multiple stab wounds in her shoulder, neck, hands, and arm. Her chin was sliced open, and the tip of one finger was almost completely severed. Also, Weaver's trachea was fractured. Weaver's husband and sister—who called 911—provided emergency medical aid until the paramedics arrived. Weaver was airlifted to the hospital, where she received blood transfusions while surgeons closed her stab wounds and reattached the tip of her finger.

control of the vehicle," reasoning that "[m]aybe you have an attempt by the assailant but you certainly do not have an abduction." The jury, by choosing to convict Ford of abduction rather than attempted abduction, expressly rejected this theory. Said differently, had the jury believed that Ford failed to gain control of the vehicle, they would have convicted him of attempted abduction, in accordance with the requested jury instruction, rather than the completed crime.

For these reasons, we hold that the evidence was sufficient to establish that Ford "seize[d], t[ook], [or] transport[ed]" Weaver within the meaning of Code § 18.2-47.

### B. Whether Ford Intended to Deprive the Victim of Her Personal Liberty

We also hold that the evidence was sufficient to establish that Ford acted with the intent to deprive Weaver of her personal liberty. "'Intent is a state of mind that may be proved by an accused's acts or by his statements and that may be shown by circumstantial evidence.'" Wilson v. Commonwealth, 249 Va. 95, 101, 452 S.E.2d 669, 673-74 (1995) (quoting Wright v. Commonwealth, 245 Va. 177, 193, 427 S.E.2d 379, 390 (1993)). Thus, when determining whether a defendant acted with the requisite criminal intent, the fact finder may consider "all the circumstances revealed by the evidence," including the defendant's "conduct and statements." Hughes v. Commonwealth, 18 Va. App. 510, 519-20, 446 S.E.2d 451, 457 (1994) (*en banc*) (internal quotations omitted).

Here, the evidence, when viewed in the light most favorable to the Commonwealth, establishes that Ford lured Weaver to his home for some unspecified purpose. When she tried to leave, he pulled out a knife and jumped through the open window of her car. As she attempted to drive away, he stabbed her several times with the knife until the blade broke off inside of her shoulder. All the while, Ford forcefully struggled to obtain control of the car, jerking the steering wheel in the direction opposite of the one in which Weaver was attempting to drive. From these facts, the jury could readily have concluded that Ford, from at least the moment he

- 7 -

dove through the car window until the moment he fled into the woods, intended to deprive Weaver of her personal liberty.

Because a reasonable fact finder could have concluded that Ford "seize[d], t[ook], [or] transport[ed]" Weaver with the intent to deprive her of her personal liberty, we conclude that the evidence was sufficient to support Ford's conviction for abduction, in violation of Code § 18.2-47. Accordingly, we hold that the trial court did not err in denying Ford's motion to strike.

### III. CONCLUSION

For these reasons, we hold that the trial court did not err in denying Ford's <u>Batson</u> challenge to the Commonwealth's exercise of its peremptory strikes, nor did the trial court err in holding that the evidence was sufficient to support Ford's conviction for abduction. Accordingly, we affirm the judgment below.

<u>Affirmed.</u>