Dwayne Allen WRIGHT, Petitioner–Appellant,

v.

Ronald J. ANGELONE, Director of the Virginia Department of Corrections, Respondent–Appellee.

No. 97–32.

United States Court of Appeals, Fourth Circuit.

Argued June 3, 1998.

Decided July 16, 1998.

**ARGUED:** Douglas Fredericks, Norfolk, Virginia, for Appellant. Robert Quentin Harris, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellee. **ON BRIEF:** Richard Ernest John Slaney, Wolcott, Rivers, Wheary, Basnight & Kelly, P.C., Virginia Beach, Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, Office of the Attorney General, Richmond, Virginia, for Appellee.

Before WILLIAMS and MICHAEL, Circuit Judges.*

Dismissed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge MICHAEL joined.

WILLIAMS, Circuit Judge:

Dwayne Allen Wright was found guilty by a Virginia jury of (1) the murder of Saba Tekle during the commission of a robbery, (2) robbery, (3) use of a firearm during a robbery, (4) murder subsequent to attempted rape, and (5) attempted rape. The jury subsequently recommended that Wright be sentenced to death based upon his future dangerousness. The trial court adopted the jury's recommendation and imposed the death sentence upon Wright. After exhausting his state appeals, Wright petitioned the United States District Court for the Eastern District of Virginia for habeas relief. The district court denied Wright's petition and his motion for a Certificate of Appealability (COA), *see* 28 U.S.C.A. § 2253(c)(1)(B)(2) (West Supp.1998); Fed. R.App. P. 22(b). After reviewing the record, briefs, and having had the benefit of oral argument, we, too, conclude that Wright has failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(1)(B)(2). Accordingly, we also deny Wright's motion for a COA and dismiss his petition.

## I.

The following facts are those recited by the Virginia Supreme Court in *Wright v. Commonwealth,* 245 Va. 177, 427 S.E.2d 379 (1993):

In October 1989, Tekle, age 33, resided with her mother and two sisters in an apartment located at Annandale, in Fairfax County. On October 13, Tekle had been visiting with Minia Gabriel at Gabriel's house in Arlington County. About 8:30 p.m., Tekle left Gabriel's house, driving Gabriel's burgundy Nissan Maxima automobile. Tekle had planned to return to Gabriel's house by 9:00 p.m.

About 9:00 p.m., Tekle's sister, Seble Kasa, was in the apartment and heard Tekle calling to her and her mother from outside the apartment. As Kasa walked to the exterior door of the apartment in response to Tekle's call, Kasa heard two gunshots, "one right after the other." When Kasa opened the door, she found Tekle lying on the floor at the bottom of a flight of stairs, and she heard someone running up the stairs.

An autopsy disclosed that Tekle had sustained a single gunshot wound to the right, upper back. The medical examiner, who performed the autopsy, testified that the bullet

went in a forward, upward and rightward direction and injured the transverse processes or little bones that protrude from the sides of the backbone of the upper two thoracic backbones. [The bullet] also hit the right first rib. Then it injured the upper lobe of the right lung and continued through the soft tissue or muscles of the neck, perforated or passed through the right internal jugular vein and then exited the right lower neck.

The medical examiner opined that Tekle's death was caused by a "[p]erforating gunshot wound in the neck." Tekle also had sustained abrasions to the left forehead and to the right knee. When Tekle's body was received by the medical examiner, it was clad only in a jacket, dress, brassiere, and some jewelry. Tekle's coat, underpants, shoes, and pocketbook were found on or near the sidewalk outside the apartment building. The police discovered two "impact areas," caused by bullets, in the stairwell outside the apartment. One impact area was in a "header" above the staircase. The other was in the wall, 43 inches above the floor on which Tekle's body was found. There was a large pool of blood on the floor around Tekle's body and a small amount of blood on the two steps nearest the floor. There was a bloody handprint on the apartment door.

Police were unable to locate the Nissan automobile at the crime scene. However,

---

* This appeal was heard by a quorum of the panel pursuant to 28 U.S.C.A. § 46(d) (West 1993).

they did find a Buick automobile with its engine running. The left portion of the Buick's steering column had been "ripped off," allowing the automobile to be started without a key. Latent fingerprints recovered from the Buick later were determined to match Wright's fingerprints. On October 14, a Washington, D.C. police officer, who had known Wright for a number of years, saw Wright operating a burgundy Nissan Maxima automobile. Wright looked at the officer and then "sped off at a high rate of speed, never stopping at [a] stop sign." The officer pursued Wright. Wright abandoned the automobile, and, after a brief chase on foot, the officer apprehended and arrested Wright. The keys to the Nissan were recovered from Wright's pocket.

After being advised of his Miranda rights and signing a waiver of those rights, Wright told a police officer that he had observed Tekle operating the Nissan automobile and decided that he wanted to steal the car. Wright followed Tekle to her apartment building and parked the Buick automobile where the police later found it. After Tekle exited her automobile, Wright approached her at gunpoint and demanded that she give him the keys to the Nissan. Tekle dropped the keys on the ground, and Wright picked them up. Wright then ordered Tekle to take off her clothes because he wanted to take her into a wooded area behind the apartment building and "have sex." Tekle removed her shoes and her underpants and then ran, screaming, toward the apartment building. Wright chased her into the building and fired two shots at her. He knew that one of the

shots hit Tekle. Wright then left the area in the Nissan and disposed of the weapon.

*Id.* at 387–88 (alterations in original).

Because Wright was only seventeen years old at the time of his crimes, criminal proceedings were initiated by petitions filed in the juvenile court. The first petition alleged that he murdered Tekle and the second petition alleged that he used a firearm in the commission of that murder. (J.A. at 15–18.) The juvenile court amended the first petition to charge Wright with capital murder because the murder occurred while in the commission of or in the attempt to commit robbery. The Fairfax County authorities later obtained a third petition against Wright in juvenile court in which they charged him with robbery.

On November 15, 1990, the Commonwealth gave formal notice of its intention to seek transfer of these charges to Circuit Court and its intention to seek the death penalty. The juvenile court granted Wright's motion for a sanity and competency evaluation. Pursuant to Virginia law, the juvenile court also held a probable cause hearing at which time the court found probable cause as to each of the three charges.[1] The juvenile court then granted the Commonwealth's motion to transfer and advised the Commonwealth that it could seek indictment.

On June 17, 1991, a grand jury returned a five count indictment against Wright. The counts included (1) murder in the course of a robbery, (2) robbery, (3) use of a firearm during a robbery, (4) murder subsequent to attempted rape, and (5) attempted rape. A Fairfax County jury later found Wright guilty on all counts and recommended the death penalty. On January 24, 1992, the

---

1. In Virginia the juvenile court is vested with "exclusive original jurisdiction" over a "child: Who is alleged to be ... delinquent." Va.Code Ann. § 16.1–241(A)(1) (1989). A child may be transferred to the circuit court, however, and tried "as an adult" under certain conditions. Virginia law provides that

a child fifteen years of age or older who is charged with an offense which, if committed by an adult, could be punishable by confinement in a state correctional facility, the court shall on motion of the attorney for the Commonwealth and prior to a hearing on the mer-

its, hold a transfer hearing and may retain jurisdiction or transfer such child for proper criminal proceedings to the appropriate circuit court having criminal jurisdiction of such offenses if committed by an adult. Any transfer to the appropriate circuit court shall be subject to the following conditions: ... The court finds: There is probable cause to believe that the child committed the delinquent act as alleged or a lesser included delinquent act which would be a felony if committed by an adult. Va.Code Ann. § 16.1–269 (1989).

trial court entered its sentencing order of death.

On direct appeal, the Supreme Court of Virginia affirmed Wright's convictions and sentence. *See Wright v. Commonwealth,* 245 Va. 177, 427 S.E.2d 379 (1993). The United States Supreme Court vacated Wright's sentence, however, based upon *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). *See Wright v. Virginia,* 512 U.S. 1217, 114 S.Ct. 2701, 129 L.Ed.2d 830 (1994). On remand, the Virginia Supreme Court reaffirmed the sentence, concluding that Wright "was not ineligible for parole," *see Wright v. Commonwealth,* 248 Va. 485, 450 S.E.2d 361, 363 (1994), and the Supreme Court denied certiorari, *see Wright v. Virginia,* 514 U.S. 1085, 115 S.Ct. 1800, 131 L.Ed.2d 726 (1995). Wright then began his state post-conviction relief proceedings. On March 14, 1996, the Virginia Supreme Court dismissed Wright's state habeas petition, and denied rehearing. On March 14, 1997, Wright filed his petition for federal habeas relief in the district court. On September 12, 1997, the district court adopted the magistrate judge's report and recommendation and ordered the petition dismissed.

## II.

On appeal, Wright contends that he is entitled to relief because (1) the Virginia circuit court lacked jurisdiction over counts four and five of the indictment; (2) the Virginia Supreme Court denied him equal protection of the law when it affirmed his convictions on counts four and five in violation of Virginia state law; (3) he was denied a fair and impartial jury when the victim's family intimidated a juror during the trial; and (4) he was denied effective assistance of counsel. He further contends that the district court abused its discretion when it denied his motion for funds to hire a neurologist pursuant to 28 U.S.C.A. § 848(q)(9) (West Supp.1998).

## A.

Before we address the merits of Wright's claims, we must determine the applicable standard of review. The Antiterrorism and Effective Death Penalty Act of 1996 provides that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West Supp.1998). We recently interpreted subsection (1) to prohibit the issuance of the writ unless (a) the state court decision is in "square conflict" with Supreme Court precedent which is controlling as to law and fact or (b) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant Supreme Court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." *Green v. French,* 143 F.3d 865, 873–74 (4th Cir.1998). "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." *Id.*

■ The Virginia Supreme Court summarily dismissed Wright's state habeas petition in a single paragraph order without a hearing. (J.A. at 478.) Wright questions, therefore, whether the more deferential standards of review of the AEDPA should apply to the state court's decision, "[g]iven the brevity of the state court order." (Petitioner's Br. at 15.) We reject Wright's assertion to the extent that he argues that the Virginia state court decision was not an "adjudication," and, therefore, not subject to the stricter AEDPA standards of review. The Virginia Supreme Court decision was clearly an adjudication in which some claims were

rejected pursuant to procedural default, while others were decided on the merits. In a similar situation, the Seventh Circuit, faced with reviewing a state court's "perfunctory" analysis of a petitioner's claim, observed:

> [O]f course the better the job the state court does in explaining the grounds for its rulings, the more likely those rulings are to withstand further judicial review. That is just realism. It doesn't follow that the criterion of a reasonable determination is whether it is well reasoned. It is not. It is whether the determination is at least minimally consistent with the facts and circumstances of the case.

*Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997); *see also Porter v. Gramley*, 112 F.3d 1308, 1313 (7th Cir.1997) (interpreting § 2254 to provide that "a responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment" (citing *Lindh v. Murphy*, 96 F.3d at 871)), *cert. denied*, — U.S. —, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998); *Lindh v. Murphy*, 96 F.3d 856, 857 (7th Cir.1996) (holding that federal habeas courts "will accord greater weight to thoughtfully reasoned [state court] decisions"), *rev'd on other grounds*, — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). As the *Hennon* court candidly acknowledged, a detailed state court order is more likely to withstand federal judicial scrutiny. This Court will not, however, presume that a summary order is indicative of a cursory or haphazard review of a petitioner's claims. As a result, unless we conclude, after an independent review of the applicable law, that the Virginia Supreme Court's resolution of Wright's claims was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," the writ will not issue. 28 U.S.C.A. § 2254(d); *see also Green*, 143 F.3d at 894.

## B.

■ Wright contends that he is entitled to a new trial because the Fairfax County Circuit Court lacked jurisdiction over counts four and five of his indictment, *i.e.*, murder subsequent to attempted rape and attempted rape. Wright argues that Virginia law requires that any charges brought against him must have originated in the juvenile court and be examined by the juvenile court in a transfer hearing before the circuit court may obtain jurisdiction over the charges. Because counts four and five of his indictment were added subsequent to his transfer to circuit court and therefore never presented in the juvenile court, he contends that the circuit court lacked jurisdiction over those counts.

It is black letter law that a federal court may grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a) (West Supp.1998); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Because Wright's claim, when pared down to its core, rests solely upon an interpretation of Virginia's case law and statutes, it is simply not cognizable on federal habeas review. *See Smith v. Moore*, 137 F.3d 808, 822 (4th Cir. 1998) (refusing to entertain claim that jury instruction misstated South Carolina law).

■ Wright relies upon the Virginia Supreme Court's decision in *Burfoot v. Commonwealth*, 23 Va.App. 38, 473 S.E.2d 724 (1996), to support his claim that the circuit court lacked jurisdiction over the last two counts of his indictment. In that case, the state court, interpreting the Commonwealth's juvenile statutes, held that

> No statute allows the Commonwealth to directly indict a juvenile for a criminal offense; process must be initiated by filing an appropriate petition in the juvenile and domestic relations district court. Additionally, the juvenile and domestic relations district court must conduct a transfer hearing before the circuit court may obtain jurisdiction over a juvenile alleged to have committed a criminal offense.

*Id.* at 728. Wright raised his claim, however, on state habeas review and the Virginia Supreme Court, interpreting its own state laws and case law, concluded that it had "no merit." *See In re Wright,* No. 95–1592 (Va. Mar. 14, 1996). As a result, the Virginia circuit court had jurisdiction over Wright as a matter of law. *See Rhode v. Olk–Long,* 84 F.3d 284, 287 (8th Cir.) (state court ruling on state court jurisdiction issue "conclusively establishes" jurisdiction for federal habeas), *cert. denied,* —— U.S. ——, 117 S.Ct. 232, 136 L.Ed.2d 163 (1996); *U.S. ex rel. Roche v. Scully,* 739 F.2d 739, 741 (2d Cir.1984) (stating that "no federal court to our knowledge has ever granted a writ where a state court's asserted lack of jurisdiction resulted solely from the provisions of state law" (internal quotation marks omitted)); *Wills v. Egeler,* 532 F.2d 1058, 1059 (6th Cir.1976) (holding that a "[d]etermination of whether a state court is vested with jurisdiction under state law is a function of the state courts, not the federal judiciary"). In fact, even if we were to conclude after an independent review that the state court's holding was incorrect, we are nevertheless bound by it as a final determination of state law by the highest court of the state. *See Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475.

Wright cites this Court's decision in *Hailey v. Dorsey,* 580 F.2d 112, 115 (4th Cir. 1978), however, to argue that a jurisdictional challenge is an exception to the rule in *Estelle.* In *Hailey,* we held that

> Matters of state law not involving federal constitutional issues are not appropriate grounds for federal habeas corpus relief. Therefore, if the error committed ... merely related to a State procedural question, the issue may not be reached in a federal habeas corpus petition unless the alleged error constituted a fundamental defect which inherently results in a complete miscarriage of justice, or exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus

is apparent. A nonconstitutional procedural error must somehow be shown to be a violation of the defendant's most fundamental rights, else it does not fall within the scope of 28 U.S.C. § 2254. In the absence of such a fundamental defect which inherently results in a complete miscarriage of justice, ... the failure to comply with the requirements of the Virginia statute, there being claimed only an error in Virginia procedural law, is cognizable in federal habeas corpus proceedings if, and only if, that failure means that the sentencing court had no jurisdiction to sentence the appellant to jail.

*Id.,* 580 F.2d at 115 (citations and internal quotation marks omitted); *cf. Wainwright v. Goode,* 464 U.S. 78, 83, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) ("It is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). Wright's reliance upon *Hailey,* however, is misplaced.

█ While it is axiomatic that we may grant the writ of habeas corpus upon the ground of lack of jurisdiction in the sentencing court, *see Ex parte Seibold,* 100 U.S. 371, 375, 25 L.Ed. 717 (1879), nothing in *Hailey* suggests that when the alleged defect is based solely upon an interpretation of state law that we may resolve the issue contrary to the highest court in the state absent a showing of a "complete miscarriage of justice." In fact, a contrary holding would be in contravention of fundamental habeas law. Therefore, because Wright does not allege a violation of any constitutional law or statute, his claim must fail unless he can demonstrate that the state court's actions resulted in a "complete miscarriage of justice." Wright has failed to present any evidence to this Court to suggest that such a miscarriage of justice occurred here.

Accordingly, Wright is not entitled to relief.[2]

---

**2.** In addition, the evidence of Wright's guilt of the crimes charged was overwhelming. *See Calderon v. Thompson,* —— U.S. ——, ——, 118 S.Ct. 1489, 1503, 140 L.Ed.2d 728 (1998) (the miscarriage of justice exception is available to one who is actually innocent of the underlying crime, *i.e.,* a habeas petitioner showing that " 'it is more

likely than not that no reasonable juror would have convicted him in light of the new evidence' presented in his habeas petition" (quoting *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995))); *cf. Bousley v. United States,* —— U.S. ——, ——, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998) (holding that " 'actual

### C.

■ Wright next contends that the Virginia Supreme Court denied him equal protection of the law in violation of the Fourteenth Amendment when, prior to all precedent, it ruled in his state habeas proceeding that he could be tried as an adult in the circuit court despite the Commonwealth's failure to comply with Virginia's substantive law. Specifically, Wright argues that "[i]n no case either prior to, or subsequent to, the case at bar, ... did the Virginia appellate court approve a transfer when there was a substantive defect in the transfer procedure." (Petitioner's Br. at 23.)

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a) (West Supp.1997). Wright is not currently detained as a result of a decision of the Virginia Supreme Court in the state habeas action. Accordingly, we agree with the district court that this claim, a challenge to Virginia's state habeas corpus proceedings, cannot provide a basis for federal habeas relief. *See Bryant v. Maryland,* 848 F.2d 492, 493 (4th Cir.1988) (holding that errors and irregularities in connection with state post-conviction proceedings are not cognizable on federal habeas review).[3]

### D.

Wright also contends that his Sixth Amendment rights were violated when the victim's family intimidated a juror, thereby tainting the entire jury and denying Wright a fair and impartial jury. On state habeas review, the Supreme Court of Virginia held that Wright could have raised this issue on direct appeal, but did not, and therefore the claim was procedurally defaulted under *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680, (1974) (holding that claims that could have been raised on direct appeal, but were not, cannot be raised on state collateral review). Wright, however, challenges the application of the procedural default rule to his Sixth Amendment claim. He asserts that his claim is not defaulted because it was raised and ruled upon by the Virginia Supreme Court on direct appeal.

■ "Under federal habeas law, we are not at liberty to question a state court's application of a state procedural rule because a state court's finding of procedural default is not reviewable if the finding is based upon an adequate and independent state ground." *Williams v. French,* 146 F.3d 203, 208–09 (4th Cir.1998) (citing *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)). A state procedural rule is adequate if it is regularly or consistently applied by the state court, *see Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," *Ake v. Oklahoma,* 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). We have recognized that "the procedural default rule set forth in *Slayton* constitutes an adequate and independent state law ground for decision." *Mu'min v. Pruett,* 125 F.3d 192, 196 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997); *see also Bennett v. Angelone,* 92 F.3d 1336, 1343 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 503, 136 L.Ed.2d 395 (1996); *Spencer v. Murray,* 18 F.3d 229, 232 (4th

---

innocence' means factual innocence, not mere legal insufficiency"). And further, even if Wright had not been charged with and found guilty of attempted rape and murder subsequent to an attempted rape, the circumstances of these crimes would have been admissible at the sentencing phase for the jury's consideration. Therefore, even if the jurisdictional question was improperly resolved, whether Wright had been indicted for the last two charges or not had no practical effect on the sentencing phase of the trial. *See Calderon,* —— U.S. at ——, 118 S.Ct. at 1503 (miscarriage of justice exception available to one who is actually innocent of the death penalty, *i.e.,* a habeas petitioner who proves "by clear and convincing evidence" that, but for the constitutional error, no reasonable juror would have found him eligible for the death penalty) (citing *Sawyer v. Whitley,* 505 U.S. 333, 348, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)).

3. We note that Wright fails to identify any factually analogous case law sufficient to invoke an equal protection analysis. Therefore, even if this claim were cognizable, we readily hold that it has no merit.

Cir.1994). Therefore, absent cause and prejudice or a miscarriage of justice to excuse the procedural default, we may not review Wright's constitutional claim because the state court declined to consider its merits upon the basis of an adequate and independent state procedural rule. *See Harris*, 489 U.S. at 262, 109 S.Ct. 1038.[4]

Because Wright does not attempt to establish cause and prejudice or actual innocence to excuse his default, we do not consider whether either exists. *See Gilbert v. Moore*, 134 F.3d 642, 656 n. 10 (4th Cir.1998) (en banc).[5] Accordingly, the district court did not err in concluding that Wright's claim was procedurally defaulted.[6]

### E.

Finally, Wright contends that his trial counsel was constitutionally ineffective be-

cause he (1) failed, in preparation for his juvenile court transfer hearing, to investigate mental health records allegedly indicating that Wright suffered severe mental disabilities; (2) failed to object to the trial court's jurisdiction over counts four and five of Wright's indictment which were not presented to the juvenile court; (3) failed to investigate the court-appointed mental health expert before counsel recommended him; and (4) failed to investigate and present significant mitigation evidence during the penalty phase of the trial.

To prove a constitutional claim for ineffective assistance of counsel, a petitioner must show that his counsel's representation was deficient and that he was actually prejudiced by the deficiency. *See Strickland v.*

**4.** Even if we could review the Virginia Supreme Court's application of *Slayton*, we would conclude that Wright's assertion that the Virginia Supreme Court ruled upon his claim on direct appeal had no merit. Logic dictates that if the Supreme Court of Virginia had considered and rejected his Sixth Amendment claim on the merits, the court simply would have applied the procedural bar rule set forth in *Hawks v. Cox*, 211 Va. 91, 175 S.E.2d 271, 274 (1970) (precluding consideration in state habeas proceedings of claims considered on their merits during direct review), rather than the procedural default rule set forth in *Slayton*, in passing on his petition for state habeas review. That the Supreme Court of Virginia applied the rule in *Slayton* dictates the conclusion that the identical court did not believe that it had considered the merits of Wright's federal claim on direct appeal. *See Mu'min v. Pruett*, 125 F.3d 192, 197 (4th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997).

**5.** Objective factors that may constitute "cause" include: (1) "interference by officials that makes compliance with the State's procedural rule impracticable," *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (internal quotation marks omitted); (2) "a showing that the factual or legal basis for a claim was not reasonably available to counsel," *id.* at 494, 111 S.Ct. 1454; (3) novelty of the claim, *see Reed v. Ross*, 468 U.S. 1, 12–16, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); and (4) constitutionally ineffective assistance of counsel, *see Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

**6.** Even if we were to consider Wright's claim on the merits, he would not be entitled to habeas relief. Wright contends that he was denied a fair and impartial jury because the victim's family

intimidated a juror (Ms. Simpkins) during a lunch break, and even though that juror was subsequently removed from the panel, the trial court failed to conduct a thorough and complete investigation to determine whether the entire panel had been tainted by the incident.

In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court held that "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 229, 74 S.Ct. 450. To establish a basis for relief, the petitioner must first "introduce competent evidence that there was an extrajudicial communication or contact, and that it was more than innocuous interventions." *Howard v. Moore*, 131 F.3d 399, 422 (4th Cir.1997) (en banc) (internal quotation marks and citations omitted), *pet. for cert. filed* (May 22, 1998) (No. 97–9263).

In this case, the trial court questioned Ms. Simpkins individually and then the entire jury panel about the alleged communication. The court dismissed Ms. Simpkins from the panel, but denied Wright's motion for a mistrial. The court found that there was no communication between the victim's family and any juror, including Ms. Simpkins, (J.A. at 305), and further, that nothing that Ms. Simpkins or any member of the victim's family did inside or outside the courtroom "in any way influenced any juror who decided this case." (J.A. at 306–07.) The trial court's conclusions that no communication occurred and that the jury was not influenced by the incident are factual findings entitled to a presumption of correctness absent "convincing evidence" to the contrary. *Id.* Wright simply has failed to present any evidence to suggest that the jury was improperly influenced by the incident.

*Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Our review of counsel's performance is "highly deferential"; we afford a strong presumption that it was within the wide range of professionally competent assistance. *Id.* at 689, 104 S.Ct. 2052. To establish actual prejudice, the petitioner must convince us that in the absence of unprofessional errors by his attorneys there is a reasonable probability, *i.e.,* one adequate to undermine our confidence in the result, that "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### 1.

■ We agree with the district court that Wright's counsel was not constitutionally ineffective for failing to present during the juvenile court transfer hearing certain mental health evidence that Wright claims suggested that he was mentally retarded, learning disabled, and possibly brain damaged. Wright's counsel requested a psychiatric evaluation promptly after being notified that the Commonwealth intended to transfer Wright to circuit court. In his request, counsel indicated that Wright had been involuntarily committed to a psychiatric institution, and that he had been diagnosed with major depression and psychotic features, conduct disorders, and severe learning disabilities. The motion was granted. The resulting psychiatric report concluded, however, that Wright did not have any major mental illness, organic brain syndrome, or mental retardation. Counsel subsequently moved for a continuance because the psychiatric report regarding sanity at the time of the offense had not been completed. Upon receipt of the report two days prior to the scheduled hearing, counsel again moved for a continuance because he wanted an additional, independent evaluation. The juvenile court denied the motion based, in part, on its belief that the issue of sanity at the time of the offense was irrelevant to the transfer proceedings. On May 2, 1991, the juvenile court approved Wright's transfer to circuit court.

We cannot say that Wright's attorney's performance was outside the wide range of professionally competent assistance. Coun-sel requested a mental evaluation of Wright, notified both the juvenile court and the evaluators of Wright's mental history, and then requested a second evaluation after receiving what counsel believed was an unfavorable report under the circumstances. We agree with the district court that "[c]ounsel was simply unsuccessful, not constitutionally deficient." (J.A. at 598.) Accordingly, the Virginia Supreme Court's rejection of Wright's claim was not an unreasonable application of the legal principles of *Strickland* to the facts presented.

### 2.

■ Second, we readily conclude that counsel's failure to challenge the jurisdiction of the circuit court over the attempted rape and murder in the commission of an attempted rape charges on direct appeal did not constitute ineffective assistance of counsel. The Virginia Supreme Court fully evaluated this purely legal claim on state habeas review and found that it had no merit. Consequently, Wright was not prejudiced by counsel's failure to raise the issue at trial or on direct appeal.

### 3.

■ Wright's claim that his counsel was constitutionally ineffective for failing to conduct a reasonable investigation before recommending Dr. Stanton Samenow to the court as mental health expert is also without merit. On cross-examination, Wright's counsel learned for the first time that Dr. Samenow was the co-author of a study in which he concluded that mental illness and environment are not responsible for people committing crimes, but that criminals act because they develop an ability to "get away with" their crimes and "live rather well" as a result. (J.A. at 243.) Dr. Samenow further testified that he did not believe that Wright was delusional, suffered hallucinations, or was mentally ill. Obviously, this testimony dealt quite a blow to Wright's mitigation defense. In fact, Wright's attorney admits that if he had known of Dr. Samenow's studies, he would not have enlisted his assistance.

As previously noted, to obtain habeas relief under *Strickland,* a habeas petitioner must

demonstrate both that his counsel's representation was objectively deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. We will assume, without deciding, that counsel's failure to investigate adequately Dr. Samenow's background prior to recommending him to the court was unreasonable. This conclusion alone, however, does not warrant relief because we hold that Wright has failed to satisfy the prejudice prong of *Strickland.*

Although portions of Dr. Samenow's testimony were less than favorable to Wright's defense, counsel effectively used Dr. Samenow to present a significant amount of mitigating evidence to the jury. Dr. Samenow testified that Wright possessed a borderline I.Q. and that he suffered from many mental and emotional problems. We further note that Dr. Samenow aided counsel in preparing the cross-examination of the Commonwealth's expert, Dr. Centor, and effectively discredited Dr. Centor's prediction of Wright's future dangerousness by arguing that mental health experts are not good predictors. Dr. Samenow, therefore, not only presented mitigating evidence on Wright's behalf, but he also challenged the Commonwealth's evidence of Wright's future dangerousness. Based upon the foregoing, we cannot say that the Supreme Court of Virginia's rejection of Wright's claim was an unreasonable application of *Strickland.*

### 4.

Wright also contends that he is entitled to habeas relief because his attorney failed to investigate or present significant mitigation evidence at the penalty phase, including various psychiatric reports from Wright's 1985 and 1987 hospitalizations as well as testimony from his former probation officer Mary Anna Portner. The Virginia Supreme Court's rejection of this claim was not unreasonable.

"Failure to present particular mitigating evidence often leads to claims that counsel should have introduced such evidence or investigated further [while] the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also." *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir.1998). As a result, we have held that "[t]he best course for a federal habeas court is to credit plausible strategic judgment." *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir.1991).

Wright's jury was fully informed of Wright's brother's early death, his absent father, his trouble in school, his depression, and his borderline intelligence through the testimony of Dr. Samenow (J.A. at 208–20) and his mother. Wright's counsel indicated that his trial strategy was to introduce evidence of Wright's background through Dr. Samenow rather than people who had not seen Wright in years. Counsel believed that Dr. Samenow would give the evidence added significance while simultaneously laying the foundation for his mental assessment. (J.A. at 467.) We must respect this reasonable trial tactic.

As to counsel's alleged deficiency in failing to present Wright's prior medical reports, counsel provided the reports to Dr. Samenow and Dr. Centor, the prosecution's expert, as well as Dr. Mauer, the juvenile court appointed evaluator. All three of these evaluators determined that Wright did not suffer from mental retardation or significant brain damage. Counsel stated that he pointed out the earlier reference to possible organic brain damage to Dr. Samenow, but he was satisfied with Dr. Samenow's explanations for his disagreement with the opinion and, therefore, did not believe that it was necessary to pursue the evidence any further. This Court has previously recognized that "[m]ental health evidence like that of [a petitioner's] organic brain dysfunction is a double-edged sword that might as easily have condemned [petitioner] to death as excused his actions." *Truesdale*, 142 F.3d at 755. This fact, coupled with the existence of three contemporaneous and consistent evaluations concluding that Wright did not suffer from an organic brain dysfunction, prohibits us from concluding that counsel was deficient in failing to delve into evaluations performed five to seven years earlier.

Wright further claims that counsel was ineffective for failing to contact Officer Port-

ner to provide favorable testimony on his behalf. Wright neglects, however, that while Officer Portner may have offered some positive remarks, in her 1985 report she opined that Wright would "never internalize the necessary behavior controls to avoid further court contact" and that he would "most likely [ ] be a continuing individual within our juvenile system." The 1985 and 1987 medical reports contain similar disturbing observations regarding Wright's behavior. The hard truth is that in the years since all these reports were made, Wright had, *in addition to Tekle*, murdered two people and seriously wounded another. As a result, earlier reports suggesting that he could be rehabilitated would have had little effect on a jury. In sum, we readily conclude that, even if counsel's conduct were deficient, we are confident that the presentation of this evidence would not have changed the results of the proceedings below.[7]

### F.

Finally, Wright contends that the district court abused its discretion, *see Williams v. Martin*, 618 F.2d 1021, 1026 (4th Cir.1980), when it denied his motion for funds to hire a neurologist to determine the existence of an organic brain disorder. (J.A. at 482.) We affirm the district court's decision.

Federal law provides:

Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under paragraph (10). No ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.

21 U.S.C.A. § 848(q)(9) (West Supp.1998); *see also In re Pruett*, 133 F.3d 275, 279 (4th Cir.1997). The district court cited the Seventh Circuit's reasoning in *Burris v. Parke*, 130 F.3d 782 (7th Cir.1997), when it denied Wright's motion. In *Burris*, the petitioner had been shot in the head years before he committed his crimes and he argued, consequently, that he should have the opportunity to explore whether he suffers from brain damage as a result. The *Burris* court upheld the denial of funds because two psychiatrists and a psychologist had examined petitioner during the course of the proceedings and all concluded that there was no indication of brain damage. Accordingly, the court held that Burris had not shown that a neurologist was "reasonably necessary" to his representation. *Id.*, 130 F.3d at 784.

■ Likewise, Wright was examined by three mental health experts subsequent to his arrest, *i.e.*, Dr. Mauer, Dr. Samenow, and Dr. Centor, and all three opined that Wright was not brain damaged. We have held that an expert should be appointed "when a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance." *Williams*, 618 F.2d at 1026. We agree with the district court that any questions regarding Wright's mental deficiencies were thoroughly investigated, presented to the jury, and ultimately resolved at trial. Consequently, the district court did not abuse its discretion when it concluded that a fourth expert opinion was not "reasonably necessary" to Wright's defense.

Moreover, even if Wright were able to obtain a favorable medical report, under the AEDPA he would be procedurally barred from presenting this new claim in federal court unless he shows that

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

---

7. We also reject Wright's claim that the cumulative effect of his counsel's errors constituted deficient performance.

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2)(B) (West Supp. 1998). Wright cannot point to any new rule of constitutional law made retroactive by the Supreme Court supporting his claim, and he has failed to show why the factual predicate for this claim could not have been discovered earlier. As a result, the appointment of a neurologist at this juncture of his proceedings would be futile.[8] Accordingly, the district court did not abuse its discretion when it declined to appoint the requested expert.

### III.

In conclusion, for the reasons set forth above, we hold that Wright has failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. 2253(c)(1)(B)(2). Accordingly, we deny his motion for a COA and dismiss his petition.

*DISMISSED.*

---

8. As to the second requirement for overcoming procedural default, innocence of the "underlying offense," Wright does not allege that he did not murder Tekle. Rather, he contends that a diagnosis of organic brain dysfunction may make him "innocent of the death penalty." Because we conclude that Wright fails to meet the first requisite for the assertion of a new claim, we need not decide whether this assertion, even if true, would satisfy 28 U.S.C.A. § 2254(e)(2)(B) (West Supp. 1998). While the Fourth Circuit has not addressed the meaning of 28 U.S.C.A. § 2254(e)(2)(B), we note that other circuit courts narrowly have interpreted the identical language in § 2244(b)(2) to require that habeas petitioners demonstrate actual innocence of the underlying crime to file a successive habeas petition on the basis of newly discovered evidence. A claim of "innocence of the death penalty" only is no longer sufficient to warrant review. *See Hope v. United States,* 108 F.3d 119, 120 (7th Cir.1997) (concluding that a successive habeas petition "may not be filed on the basis of newly discovered evidence unless the motion challenges the conviction and not merely the sentence"); *Greenawalt v. Stewart,* 105 F.3d 1287, 1287–88 (9th Cir.1997).