RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0211p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ROBERT CARL FOLEY,

         *Petitioner-Appellant,*

    *v.*

                         No. 13-5459

RANDY WHITE, Warden,

         *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:00-cv-00552—Danny C. Reeves, District Judge.

Argued: April 27, 2014

Decided and Filed: August 26, 2016

Before: SUTTON, COOK, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Euva Blandford, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, for Appellant. **ON BRIEF:** Euva Blandford, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, Michael J. O'Hara, O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Crestview Hills, Kentucky, for Appellant. David W. Barr, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

    COOK, J., delivered the opinion of the court in which SUTTON, J., joined. WHITE, J. (pp. 7–12), delivered a separate dissenting opinion.

1

_____

**OPINION**

_____

COOK, Circuit Judge. A Kentucky jury sentenced Robert Foley to death for the 1991 shootings of brothers Lynn and Rodney Vaughn. *Foley v. Commonwealth*, 942 S.W.2d 876, 879 (Ky. 1996). After exhausting all available appeals, Foley moved under 18 U.S.C. § 3599(a)(2) and (f) for the district court to appoint counsel and grant funds to retain experts in anticipation of state clemency proceedings. Foley requested a neuropsychologist to evaluate the impact of multiple head injuries on his mental functioning. He also sought a ballistics and crime-scene reconstruction expert to support his contention that he shot Rodney in self-defense and that someone else shot Lynn. The district court granted his motion to appoint counsel but denied expert funds as not reasonably necessary for Foley's clemency bid. Discerning no abuse of discretion in the district court's decision, we AFFIRM.

Under 18 U.S.C. § 3599(f), a district court may authorize "the payment of fees related to an expert witness whose 'services are reasonably necessary for the representation of the defendant.'" *Matthews v. White*, 807 F.3d 756, 759 (6th Cir. 2015) (quoting *Fautenberry v. Mitchell*, 572 F.3d 267, 272 (6th Cir. 2009) (Moore, J., concurring)). A district court should approve funds when "a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance." *Id.* at 760 (quoting *Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998)). In the clemency context, "the petitioner must show that the requested services are reasonably necessary to provide the Governor and [Parole Board] the information they need in order to determine whether to exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice." *Id.* (quoting *Brown v. Stephens*, 762 F.3d 454, 460 (5th Cir. 2014)).

We review a district court's decision to deny funds for an abuse of discretion. *Fautenberry*, 572 F.3d at 268. "A district court abuses its discretion where it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Id.* at 268–69 (quoting *Getsy v. Mitchell*, 495 F.3d 295, 310 (6th Cir. 2007) (en banc)). If a district court acts within its sound discretion, its decision stands "even if we would

have decided the matter differently." *Id.* at 270 (quoting *Workman v. Bredesen*, 486 F.3d 896, 923–24 (6th Cir. 2007) (Cole, J., dissenting)).

Foley insists the district court abused its discretion in denying funds for a neuropsychologist and a ballistics and crime-scene reconstruction expert. We examine each request in turn.

### A.    *Neuropsychologist*

Foley alleges he suffered several head injuries throughout his life that may have contributed to his violent behavior. In support of his request for a neuropsychologist to evaluate the effect of these injuries, he supplied an affidavit from his mother Lois Foley, transcripts of his family's post-conviction testimony, a newspaper article, medical records, and a document from the Kentucky Department of Corrections.

In her affidavit, Lois swore that she ingested harmful substances when pregnant with Foley and that Foley experienced multiple head injuries as a child and as an adult. Post-conviction testimony from Lois and Foley's brother mirrored those allegations. According to the newspaper article, Foley—although not seriously injured—required hospital treatment after a car wreck in 1975 but an x-ray of Foley's head taken after that accident showed no cranial injury. Similarly, he was involved in another car crash in February 1991, causing lower-back pain and an abrasion on his forehead, and he experienced temporary leg numbness in May 1991. A CT scan and x-ray of Foley's head after the second accident came back normal. Finally, the prison document details an incident in 2011 when Foley became "woosy" and fell, remaining unconscious for one to three minutes.

In denying funds, the district court found that "Foley does not have a long history of multiple head injuries, a history of childhood developmental issues, and is not of extremely low intelligence." To the contrary, Foley "was quite intelligent and had been fully involved in assisting his own defense. He had no history of mental illness . . . [and] was married and had been operating his own trucking company." Moreover, the district court noted that "Foley's competency and mental health have been discussed, analyzed, and adjudged numerous times

before this Court and others, and his arguments have consistently been found to be without merit." Thus, no reasonable necessity supported Foley's request for a neuropsychologist.

Foley claims the district court clearly erred in finding that he lacked "a long history of multiple head injuries." But given the lack of medical documentation to support his family's testimony and the absence of any indicators of brain damage or mental illness in the record, the district court's assessment was not clearly erroneous. Though Foley points to his past acts of aggression as evidencing brain trauma, his background and criminal history suggest that he is violent, not mentally impaired.

Foley further argues that the district court's order flouts our decision in *Matthews v. White*, 807 F.3d 756 (6th Cir. 2015), by relying on prior state and federal court adjudications concerning Foley's mental health. In *Matthews*, we held that the district court abused its discretion by "appear[ing] to rely on an incorrect rule that § 3599 funding is available only for use in federal proceedings and [by] not otherwise explain[ing] its reasons for denying the request." *Id.* at 757–58. In discussing possible rationales for the district court's decision, this court mentioned that "it remains unclear why [defendant's] prior litigation of mental-health issues *alone* means that a new evaluation cannot be 'reasonably necessary' for his clemency petition." *Id.* at 763 (emphasis added) (citing *Sanborn v. Parker*, No. 99-678-C, 2011 WL 6152849, at *1 (W.D. Ky. Dec. 12, 2011)). This language in *Matthews* cannot support Foley's position that a district court abuses its discretion by relying—in part—on prior decisions addressing similar issues. Here, the district court independently reviewed the record, noted the prior decisions, and found the reasons underlying them persuasive before reaching its conclusion. And the court recognized that "previous findings of competency . . . are not dispositive of Foley's [§ 3599] motion." We therefore discern no abuse of discretion.

### B. Ballistics and Crime-Scene Reconstruction Expert

Foley also requests an expert in ballistics and crime-scene reconstruction to support his allegations of actual innocence and self-defense. He attached to his motion an affidavit from an expert, John Nixon, explaining how the victims' injuries and the bullet trajectories are consistent

with Foley's version of the events.  Foley insists that Nixon requires additional funds to more thoroughly review the case.

The district court denied Foley's request, finding that "[g]iven the expansive and detailed nature of the record of this case, a 'full' review of a ballistics expert would only be redundant of what is already contained in the record."  Specifically, the court explained that Foley's lay witness, Pershing Hayes, testified at trial about the bullet trajectories and implied that Foley could not have shot Lynn Vaughn.  The court also found that "Foley now has the benefit of [Nixon's] expert opinion," rendering further analysis duplicative.  Finally, the court noted that "[t]he jury, along with various appellate and reviewing courts, . . . found the overwhelming evidence of guilt far outweighed any far-reaching allegation of self-defense and actual innocence."

Foley claims the district court clearly erred in finding that Hayes testified at trial about the trajectory and irregularity of bullets found at the scene.  He notes that the trial court sustained an objection to Foley's attorney asking Hayes about the angle of the bullets.  But Foley ignores that Hayes's complete ballistics analysis appears in Hayes's avowal testimony.  The district court thus correctly concluded that the record contains Hayes's ballistics testimony for the Kentucky Governor to review.

Next, Foley again cites *Matthews* in arguing that the district court committed legal error by relying on previous decisions regarding the ballistics testimony.  But the district court relied on these decisions because they persuasively described the overwhelming proof of Foley's guilt and supported its duplicative-evidence rationale.  It was entitled to do so.

Foley maintains that additional funds are reasonably necessary for Nixon to "review more of the case materials; create diagrams of the projectiles based on witnesses' testimony and the autopsy reports, and to produce a computer animation of events based on the witnesses' testimony and the autopsy reports."  In his affidavit, however, Nixon explained that he reviewed the autopsy reports of both Vaughn brothers, the lab reports describing the bullets and bullet fragments, the trial testimony and report of the state's ballistics expert, and the trial testimony of the witnesses to the murders.  Foley fails to identify any additional materials that Nixon has yet

to examine.  Given the comprehensive nature of Nixon's report, the district court's finding that further evaluation of the evidence is not reasonably necessary makes sense and fell within its discretion.  *See Fautenberry*, 572 F.3d at 270–71 ("[Petitioner] advanced no evidence from which the district court could find that [the expert's] evaluation would not be duplicative of information already available to the state executives entertaining his clemency petition.").

Finally, we note that Foley is under additional death sentences for murdering four people in 1989.  *Foley v. Commonwealth*, 953 S.W.2d 924, 928 (Ky. 1997).  The ballistics and crime-scene evidence he seeks to present fails to address those crimes.

For these reasons, we AFFIRM.

---

**DISSENT**

---

HELENE N. WHITE, Circuit Judge, dissenting.  I respectfully dissent.

The district court did not have the benefit of *Matthews v. White*, 807 F.3d 756 (6th Cir. 2015), which was decided during the pendency of this appeal, and directs that a court's determination whether § 3599(f) funds are reasonably necessary must focus on whether "a substantial question exists over an issue requiring expert testimony for its resolution and the [petitioner's] position cannot be fully developed without professional assistance." *Id.* at 760–61 (quoting *Wright v. Angelone*, 151 F.3d 151, 164 (4th Cir. 1998)).  *Matthews* emphasized that clemency proceedings "are a matter of grace entirely distinct from judicial proceedings," and that a petitioner requesting funds under § 3599(f) for the purpose of clemency proceedings need only "show that the requested services are reasonably necessary to provide the Governor and Board of Pardons and Paroles the information they need in order to determine whether to exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice." *Matthews*, 807 F.3d at 760 (quoting *Brown v. Stephens*, 762 F.3d 454, 460 (5th Cir. 2014) (quoting *Harbison v. Bell*, 556 U.S. 180, 192 (2009)).

## Neuropsychological Evaluation

As for Foley's request for funding for a neuropsychological evaluation, the district court clearly erred in finding that Foley does not have a long history of multiple head injuries, given the affidavit of Foley's mother,[1] and post-conviction testimony from his mother and brother.

---

[1]According to Lois Foley, she was very young when she got pregnant with Foley and her "sister told me how to abort my baby by drinking bitters mixed with other things.  This did not work but I was sick afterwards." Further, when Foley's umbilical cord fell off she was frightened and threw him across the room and he hit his head on a chair; when he was four he fell off a highchair and out a window and hit his head; when he was seven he fell from a car and hit his head; and at age sixteen or seventeen, he was electrocuted by a live 220-volt electrical wire while trying to fix a water pump.  Foley also fell from a horse when he was seventeen and hit his head, was in two car wrecks between ages eighteen and nineteen, and suffered head injuries in both.  Lois Foley did not seek treatment for Foley.  Further, Foley was in another car accident in 1991 where he suffered head trauma and was treated.  Finally, Lois Foley averred that although she spoke with Foley's trial counsel, they never talked about family history and she was not asked to testify on her son's behalf.  PID 461-62.  In February 2011, Foley fell in his

*See* Maj. Op. at 3.  The district court's rationale for denying expert funds, which the majority approves, Maj. Op. at 4, was:

> Foley's competency and mental health have been discussed, analyzed, and adjudged numerous times before this Court and others, and his arguments have been consistently been found to be without merit.  Both this Court and the Supreme Court of Kentucky have held that Foley's trial counsel was neither ineffective nor unreasonable for declining to request a competency hearing.

PID 611-12.  But Foley does not seek to show that he is incompetent or not criminally responsible, and the district court's reliance on prior court rulings unrelated to clemency contravenes the *Matthews* standard, under which a petitioner need only show that the requested services are reasonably necessary to provide the officials making the clemency determination "the information needed in order to determine whether to exercise their discretion to extend grace to the petitioner . . ."  *Matthews*, 807 F.3d at 760 (quoting *Brown*, 762 F.3d at 460).  By applying an incorrect legal standard to Foley's request for a neuropsychological evaluation, the district court abused its discretion.  *See Fautenberry v. Mitchell*, 572 F.3d 267, 268–69 (6th Cir. 2009).

## Ballistics and Crime-Scene Reconstruction Expert

The district court also relied on the clearly erroneous factual finding that full review by a ballistics expert would duplicate Pershing Hayes's testimony.  At Foley's murder trial, Hayes, a friend of Foley with no formal training in ballistics, was found unqualified as a ballistics expert and was not permitted to testify regarding an out-of-court experiment he conducted.  Appendix V (8/31/1993 Trial Tr. 45, 108-09).  In the experiment, Hayes borrowed a weapon that Foley's trial counsel believed was a similar caliber weapon and fired it into a plaster wall.  App. V 43.  The trial court concluded that there was insufficient showing that the experiment duplicated the shootings.  *Id.* at 43, 106.[2]  Hayes was permitted to offer lay testimony, however, and testified

---

cell and hit his head and was unable to answer questions concerning time, day, etc., but the more he spoke the more oriented he became.

[2]When the trial court ruled Hayes unqualified to testify as a ballistics expert and the court stated it would recess for lunch, trial counsel requested a half-day continuance to secure another ballistics expert.  The trial court denied the continuance but stated it would consider the request later in the afternoon.  *Id.* at 112.  After the lunch recess, trial counsel requested that Hayes be permitted to offer lay testimony to the jury.  The trial court agreed.  *Id.* at 118.

that the bullets passed through something before hitting the wall, distorting the bullets, in one instance because a bullet shed its jacket. 9/1, 9/2 Trial Tr. 57-60. Hayes was not permitted to testify regarding the direction the bullets were fired from or the angle at which the bullets would have entered the wall. On cross-examination, Hayes testified he had no professional experience in ballistics examination and had never more than casually examined bullets that served as exhibits or been trained in how to identify bullets, agreeing that the jury was as qualified as he to determine whether a bullet's jacket had been removed. *Id.* at 161-62. On re-cross, Hayes testified, "ballistic people in your lab could have given you a full analysis," and that he was not qualified to perform that analysis. *Id.* at 75-76.

**John Nixon's affidavit**

In stark contrast, the affidavit of John Nixon offered by Foley in his supplement/amendment to his § 3599(f) motion for expert funds provides:

1. Education & background. I am originally from the United Kingdom, where I worked as a scientist and professional engineer for the UK government, **conducting weapons systems research, design, development, performance testing** . . . and **forensic examinations, including firearms . . .** I am currently a consultant with Athena Research & Consulting LLC in Bippus, Indiana, specializing in technical and forensic consulting **in the areas of incident scene reconstruction, firearms, ballistics,** munitions, and explosives. I have conducted extensive forensic engineering research and have been responsible for numerous innovations in guns and munitions design. I have published numerous research papers and technical articles . . . . In addition to testifying in UK courts, I have testified as an expert in numerous US federal courts, and many state courts, including . . . Kentucky . . . A list of publications is included in my curriculum vitae, which is appended . . .

2. I have examined materials provided by counsel for Mr. Foley in this case. These materials include that autopsy reports of both Rodney and Lynn Vaughn, as well as laboratory reports identifying the bullets and bullet fragments related to the case, including those recovered during the autopsies. In addition, I have examined the report of Charles Lanham, with the Kentucky State Police, as well as a transcript of his trial testimony. I have also read transcripts of the trial testimony of Ronnie Dugger, Pershing Hayes, Danny Joe Bryant, Phoebe Watts and Robert Foley.

3. Based upon the testimony of these individuals, as well as the reports provided to me concerning the technical evidence/testimony, and autopsies in this case, I have concluded:

  a. The trajectory of the bullets that impacted the body of Rodney Vaughn most likely indicate that he was kneeling at the time he was shot. I base this conclusion on the general trend of the bullets moving downward through the body, with most of the bullets entering in the back and exiting in the front. The downward trajectory, coupled with most of the projectiles having entered Rodney's back, indicates that Rodney must have been kneeling as, had he been standing, it would have been impossible for him to lean far enough back to create those angles. The general bullet trajectory also makes it more likely that a relatively short shooter (consistent with Foley's height [5'7"]) was standing.

  b. Rodney's injuries are consistent with him holding a gun at the time he was shot. The general trend of the bullet trajectory from left to right through Rodney's body is consistent with him being in a Weaver stance at the time he was shot . . . Someone who had experience firing handguns would be more likely to shoot using the popular Weaver stance.

  c. Additionally, the fact that the entry wounds were high up on Rodney's body indicates the likelihood that he was holding a weapon at the time he received them . . . The trajectory of the bullets that impacted Rodney, particularly those which indicate he was most likely on his knees and leaning back, would be consistent with him shooting at Lyn Vaughn while Robert Foley shot Rodney.

  d. At least one of the bullet wounds to Lynn Vaughn was consistent with Robert Foley's version of events, wherein Rodney Vaughn shot Lynn, while Lynn was charging towards him. The slight downward angle of the bullet through Lynn's body is consistent with him leaning forward at the time he was shot. The bullet to the back of Lynn's head is similarly consistent with Robert Foley's version of events that Ronnie Dugger fired a shot into the back of Lynn's head while he was lying on the floor. The slightly upward angle of the shot is consistent with someone firing from close range to the back of the head.

  e. The bullet holes in the wall of the living room are also consistent with Robert Foley's version of events. The two bullets that were in the wall above the fish tank were more likely to have come from the area where Robert Foley

> indicated Rodney Vaughn was firing from (at Lynn Vaughn). The bullet hole in the corner of the living room was more consistent with someone firing from where Robert Foley was standing. Had the bullet been fired from where Robert Foley was standing, one would expect to see a shallow groove running along the wall towards the hole where the bullet gradually entered, due to the oblique angle. There was no evidence that this was the case and, consequently, the hole is consistent with someone firing from approximately where Robert Foley alleged Lynn Vaughn was standing, towards where Robert Foley alleged Rodney Vaughn was located.

Nixon affidavit, PID 289-291 (R. 127-1) (emphasis added).

Clearly, full review by a ballistics and crime-scene-reconstruction expert would not simply duplicate Hayes's testimony.

Lastly, the district court found that because Foley "now has the benefit of [Nixon's] expert opinion," further analysis would be duplicative. PID 618. Foley's Supplement to his Motion for Expert Funding explained that Nixon performed only a limited review of some of the case materials:

> By raising small amounts of money from family, friends, and activists, Mr. Foley was able to obtain *a limited review* of *some* of his case materials by [expert John Nixon]. The expert's findings make clear that a full review of Mr. Foley's case by a crime scene reconstruction expert and ballistics expert are reasonably necessary for Mr. Foley's clemency proceedings.
>
> . . . .
>
> A complete review would entail (a) reviewing all the case materials, rather than the limited materials Nixon was able to review for the limited amount of money raised by Mr. Foley; (b) producing diagrams of the projectiles based on witnesses' testimony and the autopsy reports; and (c) producing a computer animation of events based on witnesses' testimony and the autopsy reports.

PID 287 (emphasis added). Because Foley raised only limited funds and Nixon thus did not review all the case materials, Foley has adequately shown that the service requested, a ballistic and crime-scene reconstruction expert, is "reasonably necessary to provide the Governor and Board of Pardons and Paroles the information they need in order to determine whether to

exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice." *Matthews*, 807 F.3d at 760 (quoting *Brown*, 762 F.3d at 460).

The district court's remaining reason for denying Foley expert funds under § 3599, unfavorable federal and state adjudications, is based on an improper legal standard not applicable to clemency proceedings. *Matthews*, 807 F.3d at 761. The district court's opinion relied on Foley's failure to convince the Kentucky Supreme Court and several federal Magistrate Judges that expert funding was reasonably necessary and the fact that "[t]he jury, along with various appellate and reviewing courts . . . found the overwhelming evidence of guilt far outweighed any far-reaching allegation of self-defense and actual innocence." PID 615-18.

Even assuming, as the majority states, that the district court "independently reviewed the record," Maj. Op. at 4, its review clearly was not guided by *Matthews*. Because the district court applied an incorrect legal standard to Foley's § 3599(f) request for ballistics and crime-scene-reconstruction expert funding, it abused its discretion. *See Fautenberry*, 572 F.3d at 268–69.

I would remand to the district court for reconsideration in light of *Matthews*, particularly given that the Kentucky Attorney General's office notified this court in advance of argument that it would no longer defend the district court ruling and "does not believe Kentucky has a stake in Foley's request for federal expert funds . . . to be used in the preparation of his state clemency petition." ECF 64 filed 4/18/2016.